## Case No. 6,376.

### The HENRY EWBANK.

[1 Sumn. 400.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1833.

UNDERWRITERS—CLAIM FOR SALVAGE — DERELICT —SECOND SALVORS—MARINE INSURANCE—STOPPAGE TO SAVE LIFE — APPORTIONMENT OF SALVAGE—SALVORS AS WITNESSES—APPORTIONMENT OF COSTS.

1. Underwriters cannot make any claim for salvage property in the admiralty, unless there has been an abandonment of the property to them, and it has been accepted by them.[2]

[Cited in The Bee, Case No. 1,219; The Narragansett. Id. 10,020: The Williams, Id. 17,710; The Tolomeo, 7 Fed. 500.]

2. In salvage cases, the proper course is to make all the co-salvors parties to the original libel. And if any are omitted, they need not file a new libel, where the property has been already taken possession of, and is in the custody of the court under process. But they may bring forward their claims by a suitable allegation; and thus make themselves parties to the cause, without the formality of notice or process to the other parties. Where different libels are filed by co-salvors unnecessarily, it is at the peril of paying costs.

[Cited in The Merrimac, Case No. 4,927; The Blackwell v. Sancelito Water & Steam-Tug Co., 10 Wall. (77 U. S.) 12.]

3. In cases of derelict, the habit of courts of admiralty is to allow one moiety as salvage. That proportion is not departed from, unless under extraordinary circumstances.

[Cited in The John Wurts, Case No. 7,434; McGinnis v. The Pontiac, Id. 8,801; The Charles, Id. 4,556; The Sandringham, 10 Fed. 571.]

4. If salvors, in effecting a salvage service, themselves fall into distress, and are relieved by other salvors, they do not lose their original right to salvage; but the second salvors only partake in the salvage according to their merit. Second salvors cannot lawfully make it a condition of giving assistance, that the original salvors shall abandon all claims to salvage.

[Cited in The Mayflower v. The Sabine, 101 U. S. 387.]

5. An appeal by any parties interested in the distribution of salvage, as to their shares, brings up incidentally a review of the whole decree, so far as the distribution is concerned.

6. Stoppage on the high seas, to save the lives of a distressed crew in another ship, is not a deviation from the voyage, which discharges a policy of insurance. But a stoppage merely to save property is a deviation.

[Cited in The Rising Sun, Case No. 11,858; The Charles, Id. 4,556; The Joseph C. Griggs, Id. 6,640; Peterson v. The Chandos, 4 Fed. 653; Markham v. Simpson, 22 Fed. 745.]

7. In the distribution of salvage, the owner of the salvor ship ought under ordinary circumstances to be allowed one third of the salvage. In cases of extraordinary merit, or extraordinary peril to the ship, he may found a claim to higher salvage.

[Cited in The Waterloo, Case No. 17,257; The Charles, Id. 4,556; The Charles Henry, Id. 2,617; The Saragossa, Id. 12,335; The Camanche v. Coast Wrecking Co., 8 Wall. (75 U. S.) 473; The Pomona, 37 Fed. 816.]

8. Rule of apportionment between the master, officers, and crew; and between co-salvors.

9. Salvors are ex necessitate admitted as witnesses to all facts, which are deemed peculiarly or exclusively within their knowledge. To other facts they are incompetent witnesses.

10. What constitutes a case of derelict.

11. Apportionment of costs among co-salvors and claimants.

[Cited in The Liverpool Packet, Case No. 8,-407.]

[Appeal from the district court of the United States for the district of Massachusetts.

[This was a libel for salvage against the ship Henry Ewbank, the Charleston Fire and Marine Insurance Company and others, claimants.]

Blair & Aylwin for Manners and others.

C. G. Loring and William H. Gardiner, for Wheelwright and others.

Mr. Fletcher and E. Hasket Derby, for Blaise Isserverdens and others, and for George Brewster, and for George Weissell.

Mr. Sewall, for George Turner.

Dunlap & Bulfinch, for the Henry Ewbank and cargo.

STORY, Circuit Justice. This is a libel of salvage in the case of an asserted derelict. The ship Henry Ewbank, Jeremiah N. Jaques, master, owned in Charleston, (S. C.) sailed in February last from that port with a cargo of cotton and rice, bound to London. In the course of the voyage, having met with severe disaster and lost her rudder, she was on the 12th of March, in latitude 42° 5' and longitude 53° 50' W. abandoned by the master and crew, who on the same day were taken up by the ship Marmora, of Boston, and afterwards safely arrived at that port. At the time of the abandonment, the ship (as described by Captain Jaques) was completely unmanageable; her cargo (the rice being stored in bulk) was snifting, so as to throw her gunwale into the water in every gale; and she was waterlogged, and in imminent peril of foundering from the nature of her cargo, and her forlorn situation. On Monday, the 1st of April, the British barque Hope, Lister master, bound on a voyage from Liverpool (England) to New York, with a large number of passengers on board, and a cargo consisting of salt, coals, and iron, fell in with the Ewbank in latitude 40°, longitude 54° W. The Hope was at this time, from the length of the passage, and the deficiency of provisions, in a disturbed and suffering state, from which she was greatly relieved by obtaining a supply from the Ewbank. The master of the Hope, with the consent of the owner of the latter, who was then on board, concluded to undertake the enterprise of getting the Ewbank into port; and accordingly his mate, Mr. Metcalf, and a suitable crew, consisting of four seamen and six passengers, were finally selected for the purpose. When the Ewbank was boarded she was found stanch and strong, but

---

[1] [Reported by Charles Sumner, Esq.]

[2] For later cases on the subject of salvage, see The Emulous [Case No. 4,480].

without any rudder, and with nine feet of water in her hold. The Hope remained by her from Monday, the 1st, until Friday, the 5th of April; and during that period the crew were employed in making a new rudder and other arrangements preparatory for their separation, which took place on the same day. After parting company, the Ewbank encountered severe weather, and the new rudder, which was a sweep, was found, after a few days' trial, altogether inadequate for the purpose, and was taken on deck. A new rudder was then constructed; but it was found impracticable to attach it in the proper position, from the prevailing heavy seas and violent winds. It was, therefore, fastened astern by a rope, which parted in the night, and thus it was lost. From that period the ship was steered wholly by her sails; continual pumping was required; little effort was made towards constructing a new rudder; and the ship was left in a good measure to drift about at the mercy of the winds and waves. This state of things remained until the 1st of May, when they fell in with the brig Padang, of Boston, Brewster master, bound to New York with a valuable cargo on board. At this time they were in latitude 40° 16' and in longitude 48° 30'; and of course they had within the last twenty-seven days lost several degrees of west longitude. The crew of the Ewbank were in a state of great discouragement and exhaustion, and in want of provisions; and were (as, I think, it cannot well be denied) entirely willing to give up the whole enterprise. After some negotiations with Captain Brewster, who was unwilling to take all the crew on board his own vessel for want of suitable accommodations, it was concluded to make an attempt to fix a new rudder, and to get the Ewbank into port. Accordingly, with the consent of the original salvors, Mr. Wheelwright, (the chief mate of the Padang,) with the assistance of some of the Ewbank's crew, constructed a new rudder, and hung it in a very ingenious and skilful manner; and, a new crew (in number seven) having been formed, consisting partly of four of the original salvors, and partly of three seamen from the Padang, the Ewbank, under the command and direction of Wheelwright and Metcalf, proceeded on the voyage, and safely arrived at Boston on the third day of June last. The Padang remained by the Ewbank until the new rudder was constructed and hung, and other suitable arrangements were made for the voyage, having had her in tow a part of the time. She then proceeded on her own voyage, and arrived safely at New York on the 14th of May last.

Such is a very brief outline of the more general facts, which are given with great particularity and clearness in the opinion of the learned judge of the district court, to which I may thus generally refer for more minute facts. I may, by and by, have occasion to glance at some facts of a controversial nature, upon which there is a great contrariety of declaration by the witnesses.

The cause came before the district court upon proceedings instituted, in the first place, on the 3d of June last by a libel by Mr. Manners, his Britannic majesty's consul, for and in behalf of the owner, master, officers, and crew of the Hope, for salvage. Upon this libel a warrant of arrest issued, upon which the Ewbank and her cargo were taken into custody by the marshal. In this libel no mention whatever is made of any other persons as co-salvors. On the sixth of July, another libel was filed by Wheelwright and others, (including all the crew, who navigated the Ewbank into port, except Metcalf,) stating the general facts, and averring, that there was an entire abandonment of the Ewbank by the original salvors; and a new enterprise undertaken by themselves; and excluding Metcalf from any share in the salvage, on account of his asserted neglect of duty and desertion; and concluding with the declaration, "that the said vessel and cargo were saved by the labors and service of your libellants, without the assistance of any other person or persons whatsoever." In this libel, also, there is a total omission to state any claim in behalf of the owner, master, and other part of the crew of the Padang; and, indeed, upon the structure of the libel there would seem to be a studied disinclination to admit any such claim. Afterwards, on the same day, another libel was filed by Blaise Isserverdens and others, owners of the Padang, in behalf of themselves, and the officers and crew of the Padang, for salvage, repelling the libel and claim of the Hope, and praying, "that no award of salvage be made to the libellants named therein." On the seventh day of June, another libel was filed by George Brewster, denying the claim of the Hope to any salvage, and praying salvage to be awarded to the owners, officers, and crew of the Padang. On the eighth day of June, a libel was filed by George Weissell, the second mate, and others, the seamen of the Padang, denying the claim of the Hope to any salvage, and praying salvage for the benefit of the owners, officers, and crew of the Padang. And lastly, on the second of July, a libel was filed by James Turner, one of the passengers, and an original salvor from the Hope, stating, that he was by artifice induced to go on board of the Padang, and could not return to the Ewbank, and praying salvage. Upon all these libels, except that of Turner, process issued in the common form, which was also served by the marshal. A claim was interposed by the Charleston Fire and Marine Insurance Company, to which the Ewbank had been duly abandoned, and the abandonment accepted, praying for restitution after an allowance for salvage. A claim was afterwards interposed by William S. Skinner, agent for the underwriters at Lloyd's, and

also for the association of underwriters at Liverpool and Glasgow, stating his belief, that they have an interest in the property, of which he would thereafter produce proofs. Upon this claim I need scarcely say, that underwriters, as such, have no right to intervene in this court, unless the property is abandoned to them, and is accepted by them, so that they have an interest in the thing, and not a mere interest in the cause. A claim, so generally framed as that of Mr. Skinner's, and so naked of all apparent interest, can have no other influence upon any court, than as furnishing some ground for delay, until proper inquiries can be made to ascertain the actual absent interests. But this, in salvage cases, would hardly be granted, unless upon circumstances of great stringency and force. I dismiss from my mind, therefore, all future consideration of this claim, which, indeed, in a technical sense, is not before the court.

Upon the final hearing of the cause, the district court decreed a salvage of one moiety of the net proceeds of the Ewbank and cargo (the same having been sold under an interlocutory order of sale), amounting to $31,488.37, and the decree distributed this salvage as follows: Three fifths of the salvage to be given to the owners, officers, and crew of the Padang, namely, one half to the owners, and the remaining one half to be divided into twenty-one shares, of which Capt. Brewster was to receive six, Wheelwright three, Weissell two, Eldridge and Betts, (salvors on board of the Ewbank,) two, and the residue of the crew (four) one share each. The remaining two fifths of the salvage were decreed to the owner, officers, and crew of the Hope; namely, to the owner one half; the other half to be divided into twenty-five shares, of which were decreed to Captain Lister six shares, to Metcalf three shares, to Watkins, Green, James, Marshall, Duggin, Turner, and Leman, (original salvors belonging to the Hope, and, except Turner, remaining during the whole voyage on board of the Ewbank,) two shares, and to the residue of the crew of the Hope (nine) one share each. The court also decreed the libel of Wheelwright and others, of Brewster, and of Weissell, to be dismissed without costs to either party, a compensation to them being decreed under the other libels, and the expenses to be paid out of the gross proceeds. [Case unreported.]

From this decree there were divers appeals interposed. The first was by the owner, officers, and crew of the Hope, to so much of the decree as awarded three fifths of the salvage to the Padang, and limited that of the Hope to two fifths. The next was by Grace, Watkins, Marshall, and Duggin, from the decree, so far as regarded the amount awarded to them; and the appeal asserted, that Metcalf was entitled to nothing, and that Hough ought not to have a double share. Wheelwright also claimed an appeal with

Grace, Watkins, Marshall, and Duggin, upon their joint libel, on account of the dismissal thereof. Wheelwright also claimed an appeal on account of the insufficiency of the salvage decreed to himself, as well as for other special causes. And lastly, the owners of the Padang claimed an appeal from the decree, so far as regarded the amount of salvage, and the portion thereby decreed to the Hope, and for other causes. No appeal was interposed by the Charleston Insurance Company, or by any other of the parties. But the actual appeals necessarily bring before the court all the substantial merits of the case, as to the amount of salvage, the persons entitled to salvage, and the proper distribution thereof.

Before I proceed to the principal matters, the state of the pleadings requires me to make a few preliminary remarks, especially as in the present case they involve some questions of costs. There is certainly a very unnecessary multiplication of libels in this case; and it is matter of regret, as well as of surprise, that a different course was not pursued in instituting the original proceedings. It would have been far more for the credit of all the parties concerned in all these libels to have admitted with frankness and distinctness all the claims of all the other salvors. There was, however, a studied desire on the part of all the libellants to bring forward in bold relief their own merits, with a studied suppression, or a very feeble acknowledgment of the claims of other salvors. The libel of the Hope has wholly forgotten the existence of the Padang. That of Wheelwright and others makes no mention of the owners of the Padang; and sets up an exclusive claim to salvage for themselves, as being the only salvors in the new enterprise, without the assistance of any other person whatsoever. The libel of the owners of the Padang repudiates the claim of the Hope, in which respect it is closely followed by the libel of Captain Brewster. So that it is impossible, in the actual posture of the facts, not to perceive, that there has been as little ingenuousness, liberality, and fulness of statement on any side, as could well be presented to the attention of the court. One cannot wink so hard as not to see, that, trusting to the libels alone, as a suitable guide to inform the court of the facts, it would have been impossible for the court not to have been led astray, and to have made shipwreck of the cause. If the demerit in these particulars had rested solely on Wheelwright and his co-libellants, I should have entirely concurred in the judgment of the district court in dismissing the libels, if not in form, at least in fact, by a denial of all costs. But it seems difficult to distinguish his case successfully from that of the libel of the Hope, and even from that of the owners of the Padang, who, while setting up their own claims, have not only denied those of the

Hope, but have also forgotten those of the co-salvors of the Hope, who actually assisted in navigating the Ewbank into port. All the libels, then, have the same common defect, that no one of them states all the facts, and all the claims of all parties; but all intentionally set up a special and exclusive merit and service. Justice then, I think, does not require the court to single out the libel of Wheelwright and others for its peculiar displeasure, or to make the parties to that libel the victims of a dismissal, which shall put upon them the burden of their own costs. I observe, too, that all these libels were served by the marshal, a proceeding by no means necessary, when the property is already in the custody of the court, upon any libel executed in rem; for then all other parties, whether they stand in the character of libellants or of respondents, may assert their respective claims by allegations filed in the court, which, being admitted by the court, are necessarily brought to the notice of all the other parties, who may contest them without the formality of a notice by process. In all cases, where unnecessary libels or claims are filed, it is at the peril of paying costs. In truth, there ought not to have been in the present case more than two libels; one on behalf of the owner, officers, and crew of the Hope, and the other on behalf of the owners, officers, and crew of the Padang, standing, as they do, upon adverse rights. See The Baltimore, 2 Dod. 132, where the owner libelled separately. Upon these libels the amount of the whole salvage might have been properly ascertained, and the relative claims of the Hope and Padang to share in it disposed of. If afterwards there had remained any conflicting interests or rights of the different salvors relative to their shares in the distribution of the salvage, they might properly at that stage of the proceedings have been brought forward by separate allegations, each party intervening pro interesse suo, as to the matters in conflict. In this way much of the complexity of the cause would have been avoided; and the litigation would, in every stage of it, have assumed the distinct character properly belonging to it; and the court would have been enabled to fix upon the proper parties, engaged in these collateral controversies, the just and exclusive responsibility for the costs occasioned thereby. Sitting in the district court, I should not have had the least hesitation in staying proceedings upon all the collateral libels, until the principal question of salvage had been disposed of; and then to have required these libels to be reformed, so as to bring forward only the peculiar claims of the parties respectively. One cannot but perceive, how large a mass of the voluminous testimony in this case is taken up in these collateral controversies, with the merits or demerits of which other parties have nothing to do. What, for example, have the Charleston Fire and Marine

Insurance Company to do with the distribution of the salvage, or the relative merits of the different co-salvors? It is not of the slightest importance to them, in what manner that distribution takes place, or who are the parties to it. The only important consideration to them is the amount of the salvage. And there is not the slightest pretext for burdening them either with the delays or the expenses incident to the distribution among the salvors. There is, fortunately, little of the whole mass of evidence, which bears upon this point of salvage; and that little is scarcely a matter of controversy between the parties. If, indeed, it were now practicable to separate the portion of the evidence bearing on the merits of the salvage from that bearing on the merits of the different salvors, I should be much disposed to apportion the costs accordingly. That is not now practicable; but the court will have some regard to it, when it comes to the apportionment of the costs. .

Passing by, for the present, any further consideration of these matters, which are preliminary in their nature, I come, then, in the first place, to the question, what amount of salvage ought to be decreed? The district court allowed (as we have seen) one moiety; the insurance company have acquiesced in this allowance; and so have the owners, officers, and crew of the Hope. The amount is contested by the other parties appellant, who ask for an increase of salvage, asserting, that it is not sufficient to compensate them for their labors, or in proportion to the merits of the salvage service. At the argument I intimated a strong disinclination to change the amount of salvage; and upon the most mature reflection I adhere to that opinion. This is a clear case of derelict, for there was an abandonment of the property, animo non revertendi. In such cases the habit of courts of admiralty has been to decree one moiety to the salvors; and by the old law no more than that was ever decreed. That rule, however, has been somewhat relaxed in modern times; but still a moiety continues to be the favored, if not favorite, proportion allowed by courts of admiralty in ordinary cases. See The Fortuna, 4 C. Rob. Adm. 193; L'Esperance, 1 Dod. 46; Rowe v. The Brig [Case No. 12,093]; The Blenden-Hall, 1 Dod. 414, 421; Elliotta, 2 Dod. 75. It is not, however, an inflexible rule; but it yields to extraordinary circumstances, greatly diminishing or enhancing the perils, and gallantry, and personal sacrifices of the salvage service. But the court on all occasions has great reluctance in deviating from a moiety, and expects a very strong case to be made out; in which, upon other principles, there would be a very great disproportion between the services and the compensation; so great, indeed, as in a moral and legal view to constrain the court to deviate from it. And there is great wisdom in thus adhering to the rule; for nothing can be more

inconvenient in the administration of justice, and especially of international justice, ex aequo et bono, than to leave every case open to the mere exercise of an unlimited discretion. Certainty in this case, as in many other cases, is far more important than mere theoretical propriety. In salvage cases it is not ordinarily in the power of a court of admiralty to fix any exact rules, which will suit many classes of cases. But whenever they can be fixed, the tendency of fixed rules to suppress litigation, and to produce uniformity of decision, is so apparent, that a judge must have more than ordinary boldness, or confidence, or presumption, who will venture to cut himself adrift from all rules, and launch upon the broad ocean of discretion, without taking counsel of the wisdom of his predecessors. For myself, I have not the slightest inclination to adventure upon such a course. I have hitherto adhered with an unshrinking confidence to the general rule of a moiety in cases of derelict. It has the support of the authority of the ablest judges for many ages (see The Fortuna, 4 C. Rob. Adm. 193; L'Esperance, 1 Dod., 46; The Blenden-Hall, Id. 414, 421; The Elliotta, 2 Dod. 75); and in an especial manner of that court, whose judgments I am bound to hold in the highest respect. On this subject I have the less need now to speak, as in the case of Rowe v. The Brig [supra], I had occasion to give my opinion at large upon this subject. To that opinion I still attach myself with unabated satisfaction. I am aware, that, by the ordinance of Louis the 14th, one-third is the rule of salvage fixed in all cases of derelict. 2 Valin, Comm. lib. 4, tit. 9, art. 27, p. 635, etc. It is, however, one third clear of all expenses, or one third of the gross value, an amount in many cases not materially different from a moiety of the net proceeds, given by the common rule of the admiralty courts. Even this positive regulation of the French Code would, if adopted generally, be far more convenient than to leave the proportion utterly unsettled; though I deem the rule of a moiety better adapted to the ordinary cases of derelict. Now, unless I were prepared to shake the common rule to its very foundation, there are no circumstances in the present case calling upon the court for the slightest deviation from it. It is an ordinary case of derelict in all its features, without any uncommon perils or difficulties, or any distinguished gallantry. The property saved is large enough to give a reasonable salvage at that rate; it is not so large as to make it an extravagant compensation. And I agree, that the value of the property saved constitutes a material ingredient in decreeing salvage. See The Blenden-Hall, 1 Dod. 414, 421; The Waterloo, 2 Dod. 433, 442. If there were any uncommon perils, sacrifices, or sufferings, they were borne by the original salvors from the Hope, before the Padang was fallen in with. But I am by no means prepared to admit, that there were any not fairly to be expected under like circumstances, or not easily to be borne by men of common skill, constancy, and firmness. If the salvors of the Hope had succeeded in getting the Ewbank into port without assistance, they could hardly have made out a higher claim. That they have accomplished it with the assistance of others does not enhance their own merits, but rather lets in the latter to share in the appropriate salvage. Indeed, no demand of a higher salvage is now made in behalf of the Hope, though some of her crew, connecting themselves with Wheelwright's libel, do assert such a claim. It is not by glowing sketches of common services, or by strong and vivid coloring impressed upon common incidents, that salvage is to be inflamed to an undue amount. Salvage, it is true, is not a question of compensation pro operâ et labore. It rises to a higher dignity. It takes its source in a deeper policy. It combines with private merit and individual sacrifices larger considerations of the public good, of commercial liberality, and of international justice. It offers a premium, by way of honorary reward, for prompt and ready assistance to human sufferings; for a bold and fearless intrepidity; and for that affecting chivalry, which forgets itself in an anxiety to save property, as well as life. Treated as a mere question of compensation for labor and services, measured by any common standard on land or at sea, the salvage of one moiety is far too high. But treated, as it should be, as a mixed question of public policy and private right, equally important to all commercial nations, and equally encouraged by all, a moiety is no more than may justly be awarded. In this respect I entirely approve of the decree of the district court.

The next question is, who are entitled to be deemed salvors? The owners, officers, and crew of the Padang contend, that they, and those, who actually navigated the Ewbank into port, are exclusively to be deemed the salvors; and that the owners, officers, and crew of the Hope, as such, are not entitled to share in the salvage. For this purpose they assume two grounds of argument; first, that the Hope rendered no effectual service to the Ewbank; and, secondly, that there was a total abandonment of the original enterprise by her crew, and an entirely new enterprise undertaken by a new crew on meeting with the Padang. It appears to me, that neither ground is maintainable, either in law or in fact. That the Hope was the first and original salvor does not, upon the evidence, admit of the slightest doubt. She found the Ewbank in a state of derelict, and put a salvage crew on board; thus taking possession, and entitling them and herself to be deemed the exclusive salvors, unless the possession should be afterwards totally abandoned, and the enterprise surrendered.

No other persons, without their consent, could intrude themselves upon that possession, or gain a title to be deemed co-salvors; and whoever, during that possession, should come in, with their consent, must be deemed to come in under that title, and not in exclusion of it. The crew of the Hope navigated the Ewbank for thirty days, exposing themselves to every peril, encountering every hardship, and struggling against adverse circumstances with all the skill, and ability, and vigor, which they possessed. During this whole period, then, they actually preserved the Ewbank; and, from the very nature of the case, there is not only no evidence, that she could have been preserved without their superintendence during this period, but there is the highest probability, that she would otherwise have foundered. We are not to indulge mere possible conjectures on such subjects. The fact, that she was thus saved, is clear; the presumption, that she might have been otherwise saved during this long period, is mere matter of conjecture, in nubibus. It is not the habit of any courts of justice to yield themselves up in matters of right to mere conjectures and possibilities; and least of all do courts of admiralty, in cases of salvage, yield themselves to imaginations of this sort. Salvors are not to be driven out of court upon the suggestion, that if they had not touched a derelict ship and cargo, the latter might in some possible way have been saved from all calamity, and therefore that the salvors have little or no merit. Such a suggestion has not, in this case, been put forth by those, who alone would seem to be entitled to propound it; I mean the owners of the Ewbank and cargo. And least of all can it be maintained in behalf of the Padang; for, whatever may be the demerits or deficiencies of the salvage service rendered by the crew of the Hope, they were the direct means, by which the Padang has been enabled to earn any salvage. If the crew of the Hope had had more skill, and more energy, and more success in their perilous adventure, there would have been no need of calling for the assistance of the Padang. And, in every possible view of the case, the boldest imagination would not venture to declare, that if the Ewbank had not been taken possession of and navigated by the crew of the Hope, she would ever have fallen in with the Padang. The fact is, that the former brought her into contact with the Padang, and were the immediate instruments of enabling the latter to continue a possession, thus far safely maintained. It would be (I confess) a new doctrine to me, that, if salvors themselves fall into a state of distress, they can obtain effectual relief only by a surrender of all their own title to salvage; that, if they were to navigate a salvage ship across the Atlantic or Pacific, and they should afterwards be incapable of proceeding farther without some substantial assistance, that assistance can be purchased only at the peril of a loss of all their antecedent services. That doctrine is not, I am aware, contended for in the present case; but I do not well see, how the reasoning can stop short of it, if followed out to its natural consequences. It is said, that the Ewbank had made no advances in her intended voyage while in possession of the crew of the Hope, and, indeed, that she had actually lost six or seven degrees of longitude, and was thus receding from her intended port. But this is no answer to the claim of salvage. If the salvors had accomplished the enterprise by getting safely into any other port, their title to salvage would have been equally indisputable; and so long as they held to their possession, or, if we may so say, so long as they clung to the wreck, it was not for others, whatever might be the want of skill or want of success of their efforts, to insist, that they were entitled to supersede the first claimants. They might refuse to lend assistance, however reprehensible such conduct might be; but they could not make it a condition of such assistance, that the original salvage service should be abandoned, or be treated as extinguished. Even if there had been an express contract to such an effect, it would have been deemed by any court in Christendom a fraudulent advantage taken of the necessities of the first salvors, and utterly void, upon the eternal principles of justice, humanity, and good faith. It would be like bargaining with a man for the purchase of his estate, while he is on a plank to save himself from shipwreck. In every view of the case, there is no possible ground, upon which the original merit of the salvage service of the Hope can be taken away or contested by those, who are merely called in to aid in, and insure, its ultimate accomplishment. The question in such cases is not, whether the original salvors shall share, but in what proportions they shall share.

Then let us turn to the other point. Has there in the present case been any absolute, voluntary abandonment of the Ewbank and cargo by the crew of the Hope? I agree, that, if there has been, then the Hope cannot now entitle herself to share in the salvage. The doctrine stated at the bar, is perfectly correct, that salvage must be earned, not by attempting merely to rescue, but by the actual rescue of the property from its perils. The property must be effectually saved. It must be brought into some port of safety; and it must be there in a state capable of being restored to the owner, before the service can be deemed completed. All the service done before that time is merely in fieri. Whatever of personal gallantry, or of laborious exertion, or of severe sacrifices, may have been already borne, it comes to nothing, unless the property is actually saved by the asserted salvors. But if saved, it is wholly immaterial, whether the salvage is by the original salvors alone, or by them with the aid of others; for the

original salvors in such cases are treated as the principals; and the whole salvage service takes effect as their act, according to the maxim, "Qui facit per alium, facit per se." Was there, then, in the present case a voluntary abandonment of the Ewbank and cargo by the crew of the Hope? In point of fact there never was. There might have been intention, design, and wishes. The discouragements brought upon the crew by past events and past ill success may have rendered all of them entirely ready and willing to be rid of the burden of all future possession, and thus to bury all their hopes of profit, as well as fears of disaster. But I cannot say, that I clearly see that such intention, design, or wishes did exist to the extent, to which the argument has been pressed. On the contrary, I am not satisfied, that there ever was a single moment when, if effectual aid and assistance should be promised, and given by the Padang, and a new rudder could be hung, the mate and crew of the Hope, or at least a great part of them, were not willing to continue the original enterprise. The whole negotiation seems to me to have been exactly what, under existing circumstances, would naturally occur; a negotiation to obtain effectual aid and assistance to navigate the Ewbank into port; and if that could not be obtained, an intent to abandon the Ewbank ex necessitate. And here let me add, that if Captain Brewster had refused to afford such aid and assistance, unless the crew of the Hope should abandon the salvage ship, and had made this the sure mode of operating upon their hopes and fears, until they had yielded her up, I should not have had the slightest doubt, that it would have been the duty of this court to have declared such an abandonment, so procured, to be utterly void, as unconscionable and inhuman. And I should have felt myself called upon to visit Captain Brewster with the punishment due to such misconduct, by a forfeiture of his own share in the salvage. But here no such negotiation is pretended, or proved. Whatever may have been the intermediate designs or wishes of the parties, there never was any actual abandonment de facto and de jure by the crew of the Hope. They never wholly abandoned the Ewbank, animo non revertendi. The exclusive possession was never surrendered in fact, or in law, by any final acts, to the Padang; and all the intermediate proceedings are to be deemed but preliminary negotiations or propositions. "Finis coronat opus." The case must take its true complexion and character from the final event. The navigation of the Ewbank into Boston was accomplished without any open visible dispossession of the original command of the crew of the Hope. The mate, Metcalf, remained on board with a part of the original crew; and an exchange was made of others for a more efficient number of the Padang's crew. Under such circumstances it is impossible, in contemplation of law, or of the true posture of the facts, to treat the case, as a case of an entire abandonment of the original enterprise, and the commencement of an entirely new one. It was nothing more than taking a new point of departure in furtherance of the old enterprise. Nor was it, in point of law, competent for Metcalf and his crew to abandon the old enterprise in behalf of the Hope, and to engage in a new enterprise of salvage exclusively for themselves. And it was equally incompetent for the officers and crew of the Padang to enter into such an engagement with a knowledge of the facts. It would have been a meditated fraud upon the rights of the other parties. A salvage crew cannot, by any shuffling or management, deprive the owners of their right to share in the salvage. They must take or lose in common with the latter. The original character adheres to them through every change; and, having assumed the character of agents, they cannot make use of their agency powers to become exclusive principals. The trust travels with them on the voyage; and is severed only by that common necessity, which overwhelms and buries the entire enterprise. But here, in point of fact, no such abandonment, legal or illegal, intentional or formal, is made out. And nothing but the strongest evidence could establish it; evidence beyond the reach of all suspicion from interest, from management, from imposition, and from private and irresponsible conduct. I follow the admitted facts; and they speak a language as unequivocal, as could be desired. The case of The Jonge Bastiaan, 5 C. Rob. Adm. 322, before Lord Stowell (a name always to be mentioned with reverence) was a much stronger case to justify the defence of an abandonment. There, a ship had struck on a rock near Harwich, had lost her rudder, and beat in her bottom; had been deserted by her crew, and was warped off by a smack with great danger and peril. Afterwards the ship sunk from the damage received; but was weighed up and brought into Harwich by six other smacks by great exertions, continued through five weeks, the original salvors not assisting at all. The objection was taken, that their conduct amounted to an abandonment of all claim to salvage. Lord Stowell, in answer to the objection, said: "She sunk afterwards, it is true; but it is not on that account to be said, that the first salvors had lost her again, or that they had abandoned their interest in her. They did not stay by the vessel; but it cannot be supposed, that, having risked so much for her recovery, they meant to desert her, whilst others were employed in their sight in weighing her up, and in saving the cargo. If they took no part in those exertions, it could only be, because they perceived, that the persons employed in the service would perform it as well without them. They had been the immediate instruments of saving her from her original danger,

and of bringing her to the place, where these other parties were enabled to complete her recovery." Language more exact or expressive could not well be found; and it applies with tenfold more force to the circumstances of the present case, than to those of the case before him.

Much stress has been laid on the ascertainment of the point, whether Wheelwright or Metcalf was in the command after the Ewbank parted from the Padang, on the voyage to Boston. I do not attach any considerable importance to this fact, let it be decided whichever way it may be. Metcalf, being originally placed in the command by the master and owner of the Hope, must, in contemplation of law, be deemed to be the commander de jure during the whole voyage. No person had any legal right to displace him, while he remained on board. And if he consented to act under another person, it must be deemed to be a mere voluntary obedience, binding on him personally, but not necessarily on the owners of the Hope. The evidence in the case, however, leaves the point quite equivocal. And I rather incline to the belief, that in fact both Wheelwright and Metcalf exercised command on board in the character of equals, without either of them yielding any acknowledged superiority to the other. But this, in my view, is quite immaterial; for no one can doubt, that Wheelwright was the real dux facti, the strong, prevailing, skilful mind, that led throughout the voyage. Metcalf appears from the evidence to have been a man not of very high character, occasionally at least given to intemperance, and somewhat deficient in energy and skill. On the other hand, it is but a moderate tribute to Wheelwright to say, that every line of the testimony proves him to be an accomplished seaman, of uncommon skill, and energy, and spirit. I have no private doubt, that he conducted in fact, whatever he might in form, the great operations of the voyage. It was the common case of the dominion of the strong over the weak or inefficient. The grounds, then, upon which an attempt is made to exclude the Hope from any share in the salvage, wholly fail, treated as matter of law, or as matter of fact. And the remaining question on this head is, in what proportion the Hope is entitled to share in the salvage. The district court gave two fifths to the Hope, and three fifths to the Padang. Both parties are dissatisfied with this allowance. It is insisted, on behalf of the Hope, that she is entitled to one half, bringing the whole into what is called, in the homely language of the common law, "hotchpot," and what is called, in the more refined language of Rome, with more classical propriety, "collation." Lord Stowell, in the case already cited of The Jonge Bastiaan, 5 C. Rob. Adm. 322, brought the whole property into hotchpot, and gave an equal share to each of the salvor-smacks. It appears to me, that his judgment in that particular case was perfectly correct and unexceptionable. But he did not affect to lay down a rule to govern all cases. Cases may easily be suggested, in which, from the inequality of the labors, and perils, and nature and extent of the services of the co-salvors, equality would not be equity; though I think, that, as a general rule for ordinary cases, the rule of equality has much to commend it by its simplicity and convenience of application. It has a strong tendency to diminish the causes of litigation, and to suppress that spirit among the parties, so notably and pertinaciously displayed in the evidence in the present case; I mean, the desire to found a claim of exclusive merit upon the studied disparagement of all other persons. If the district judge had followed the rule in the present instance, I should have felt great repugnance in altering it. But I confess myself better satisfied with the actual proportions selected by him. The apportionment is more exactly in regard to relative merit, and relative perils, and relative risk of property, than a division into moieties would have been. On the side of the Hope, it may be truly said, that there was more of peril, and hardship, and suffering, with little skill and energy, and an entire want of success. On the part of the Padang, there was great skill, energy, and success, prompt assistance, and ready co-operation, but little peril or suffering. The relative services of the vessels, the Padang and the Hope, are very nearly in the proportions of the salvage.

It has been argued, that there was positive misconduct on the part of the salvors of the Hope, by withdrawing some part of the equipments and sails of the Ewbank, and by doing great injury to some of her cabin-work and decorations. We must not always scan things of this sort with nice and curious eyes. Much must be allowed to the nature of the marine service, and much to the infirmities of human nature, resulting from ignorance, and carelessness, and the spirit, not of wanton, but of unsparing abuse. This objection does not properly lie in the mouth of the co-salvors, but in that only of the owners of the property. It may justly diminish the aggregate amount of the whole salvage; but it can furnish no peculiar ground of merit in those, who become co-salvors in the actual state of things, and take it for better or for worse. Now, it is not a little remarkable, that the owners of the saved property take no such objection. They are content with the actual state of things, imputing no blame, and seeking no redress. The case is wholly distinguishable from that of wanton plunderage and gross mischief, which might go to the forfeiture of the claim of salvage, or at least of a part thereof. But, even in such a case, it would only go to diminish the common stock of salvage in favor of the injured owner, and not transfer it to the co-salvors. Nor do I think the distressed state of the Hope at the time, when she fell

in with the Ewbank, can make any substantial difference in her merit; at least, not in respect to her co-salvors. She might have supplied her necessities, and been excused, and perhaps justified in so doing, from the abundance of the floating derelict ship; and then have left the latter to her fate. She did not stop there; but having supplied herself, undertook the not less grateful, though perilous task, of saving the residue for others. It would not, I imagine, much lessen the merit of saving a drowning man, that the salvor was an interested creditor.

Upon the whole, without entering more at large into this part of the case, I am well satisfied with the decision of the district court in apportioning the salvage between the Hope and the Padang, according to the proportions of two fifths, and three fifths. But this apportionment only applies to the proportions, in which the owners, officers, and crews of the respective vessels, which were ultimately engaged in the salvage service, should share, relatively to each other; and cannot be permitted to affect the rights of the actual salvors belonging to either vessel. The claims of the latter not only admit, but absolutely require an independent consideration.

We are next led to the consideration of the question, what proportion of the salvage ought to be decreed to the owners of the Hope and Padang, as contradistinguished from the officers and crews of those vessels? The district court decreed a moiety; and the appeals actually interposed, though not professedly dealing with the distribution of the Hope's share, do (as I think) necessarily bring the whole subject before this court for review and reconsideration. And here it seems important, if practicable, to search for some general rule; and, if none can be found, to establish one for ordinary cases, as the point must constantly present itself in almost every case of salvage. There have been no peculiar services, no uncommon sacrifices, and no extraordinary perils encountered by the salvor ships, while engaged in the salvage service in this case, and no very large amount of property was put at risk. Neither of the salvor ships broke up or discontinued her voyage; neither of them has suffered any loss or injury in tackle, apparel, keel, or cargo; neither of them was exposed thereby to extraordinary difficulties, or has had any hair-breadth escapes from imminent dangers. The owners of the Padang knew nothing, and said nothing. The owner of the Hope was present; but did no more than yield a ready assent to what was done, having no personal hazard, and assuming no extraordinary responsibility. The case, therefore, stands upon merits common to all cases of this sort, and must be decided upon general principles. The owners, then, have a just claim to share in the salvage in all cases, where their property is put at risk, in effecting the salvage service. I entirely

agree with my lamented brother, the late Mr. Justice Washington, in declaring, that no stoppage on the high seas for the purpose of saving life is, or can be, deemed a deviation from the voyage, so as to discharge the insurance on ship or cargo. Bond v. The Cora [Case No. 1,621]. The duties of humanity call upon every human being to do such acts of mercy and charity; and that duty is enforced by all the authoritative precepts of Christianity, which no one is at liberty to disregard. But I farther agree with him—Bond v. The Cora [supra]—in holding, that any farther stoppage for the purpose of saving property, is a deviation from the voyage, and discharges the underwriters. And in all cases of this sort, it is wholly immaterial, whether the owner stands his own underwriter, or the risk is borne by others at his expense. In either case his property encounters risks beyond those belonging to the ordinary prosecution of the voyage, and he is entitled to an indemnity. But the law does not stop short with a mere allowance to the owner of an adequate indemnity for the risk so taken. It has a more enlarged policy, and a higher aim. It looks to the common safety and interest of the whole commercial world in cases of this nature; and it bestows upon the owner a liberal bounty and reward, to stimulate him to a just zeal in the common cause, and not to clog his voyages with narrow instructions, which should interdict his master from any salvage service. If a bare compensation for loss and risk were allowed, what motive could any owner have to suffer his voyage to be retarded; his just expectations of profit to be frustrated; his whole commercial arrangements to be suspended upon risks, which he could neither foresee, nor guard against by any common prudence? The law has a wise regard to considerations of this nature; and it offers, not a premium of indemnity only, but an ample reward, measured by an enlightened liberality and forecast. While I agree with Lord Stowell, that the master and crew are, in strict language, the only salvors; I cannot agree to the justice of his remark, "that the owners in general have no great claim; as to labor and danger, none;" and "that they come in only upon the equitable consideration of the court for damage or risk, which their property might have incurred." The San Bernardo, 1 C. Rob. Adm. 178. This latter remark is not borne out by the subsequent practice of that eminent judge; for he has been liberal in awarding salvage to the owners. I can, with far more satisfaction, unite in the opinion of Mr. Chief Justice Marshall, in speaking on this subject in the great case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 269, where he says, "The proportion allowed to the owners of the Firm," (the saving ship,) "and her cargo, is not equal to the risk incurred; nor does it furnish an inducement to the owners of vessels to permit their cap-

tains to save those found in distress at sea, in any degree proportioned to the inducements offered to the captains and crews. The same policy ought to extend to all owners the same rewards for a service, which deserves to be encouraged; and it is surely no reward to a man, made his own insurer without his own consent, to return him very little more than the premium he had advanced." To this it may be added, that it furnishes a strong inducement to officers and seamen not to desert their own proper duty to their owner, and his interests for selfish purposes, by making them share only in subordination to, and in connexion with, those interests. If I had been called upon for the first time, to say, what, under ordinary circumstances, should constitute the proportion of the owner, I might have hesitated; but I incline to think, that it would have occurred to me, that one third would be a suitable proportion. But, if I had found that proportion to have been adopted in other cases, and to have become, in some sort, a habit in our courts of admiralty, my own judgment would have reposed upon it with an undoubting confidence. Now, upon looking into the cases, decided in the superior courts, exercising admiralty jurisdiction, it appears to me, that it will be found to have been, if not throughout, at least to some extent, a habit of these courts to award to the owner one third of the salvage. That amount has certainly been not unusual in our most commercial districts, and especially in New York and Pennsylvania. See The Harmony [Case No. 3,089]; Bond v. The Cora [Id. 1,620]. My Brother, Mr. Justice Washington, adopted it after grave examination in the case of Bond v. The Cora [supra], and I find, that it has prevailed more than any other rule in contested cases brought before the courts of the districts, in which he presided. But, what is of most powerful influence in this case, it was adopted by the supreme court in the case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, 269, 271, after the fullest deliberation, and upon solemn argument. It seems to me, that that case ought to furnish a guide for all subordinate courts under common circumstances. I do not say, that the rule should be absolutely inflexible, and not yield to any extraordinary merits, or perils, or losses on the part of the owners. Cases may exist, in which it may be quite fit to allow the owner one half, as was done in several of the cases stated at the bar. See Taylor v. The Cato [Case No. 13,786]; The San Bernardo, 1 C. Rob. Adm. 178; The Waterloo, 2 Dod. 442. But all such cases must stand upon very peculiar and pressing circumstances. Such circumstances certainly did exist in the case of The Cumberland [Case No. 3,470] decided by the district court of Massachusetts in 1815. The salvage ship in that case actually broke up her voyage, and returned back to port, keeping company with the Cumberland

through the whole period. And it was beyond doubt a perilous enterprise to all concerned. As to the case of M'Donough v. The Mary Ford, 3 Dall. [3 U. S.] 188, it furnishes no authority for a different course. In that case, the distribution was made in the district court by the award of three persons, named by the parties, and appointed by the court. See the opinion of Judge Lowell [M'Donough v. The Mary Ford] 3 Dall. [3 U. S.] 191. So that the distribution was made with the consent of the parties in interest, by way of amicable award, and can in no just respect be held to be the legal adjudication of the court, acting upon its own judgment. And the case, as to this point, never came before the supreme court, the appeal being limited to the mere question, who was entitled to the residuum after the salvage was deducted. In The Haase, 1 C. Rob. Adm. 286, Lord Stowell adopted the proportion of one third, in a case calling strongly for a high remuneration; for it appeared, that the salvor ship (which was a whaler) had lost the chief object of her voyage by this service.

Upon the whole, with the greatest deference to the opinion of the learned judge of the district court, I have come to the conclusion, that the owners of the Hope and the Padang are not, under the circumstances of this case, entitled to more than one third of the salvage. In so deciding, I have the satisfaction to know, that I am supported by his own judgment in three late cases; I mean those of The Boston [Case No. 1,668], The Hudson [Id. 6,828], and The Friendship [Id. 5,122], in which he adopted the same proportion. In apportioning the remaining two thirds of the salvage, I have not the least hesitation in expressing my sense of the merit of Wheelwright's services, as being in the very first rank. The only drawback, which there seems to be to his full measure of praise, is found in his conduct after his arrival in port, in setting up an exclusive claim for himself and his co-libellants, as the sole salvors; and in excluding their fellow-laborer, Metcalf, from all share in the salvage. There is manifest error in this; which I am not disposed to impute to any wanton disregard of the claims of others, but to a precipitate and rash judgment, acting at the moment upon warm feelings, and the belief of imaginary wrongs, and the natural delusions of self-interest. In making the apportionment between the master and the other officers, I find the usual course has been to allow the master a larger proportion than the mate, even when the latter has been put in command of the salved ship, as she is sometimes denominated by Lord Stowell. The common proportion has been, as I gather, under ordinary circumstances, double that of the mate. And it should be so; for the master, by his conduct in permitting the salvage enterprise, takes upon himself a great responsibility to his owners; and no common share

of responsibility also to the shippers of the cargo. The same enlightened policy governs here, as in other cases. The reward is liberal, to stimulate the master to assume the responsibility, as the common guardian of the interests of all concerned. But here, again, the rule is not inflexible. It yields to circumstances of a peculiar nature; and in a case of great perils, sacrifices, and hardships on the part of the commander of the actual salvors, his proportion is permitted to approach nearer to that of the master. In the present case, I feel myself compelled to make a slight deviation from the rule, though I do it with extreme reluctance, on account of the singular conflict of claims between the two classes of salvors, and the relative merits of Wheelwright and Metcalf, standing, as they do, in the same official character, and yet somewhat distinguishable in the order and value of their services.

After bestowing upon the subject considerable reflection, I have come to the conclusion, satisfactory at least to my own mind, that the distribution should be according to the following scheme. In the first place, I shall decree one third of the moiety of the net proceeds, decreed as salvage, to the owners of the Hope and Padang, in the proportions already intimated, of two fifth parts to the owners of the Hope, and three fifth parts to the owners of the Padang. In the next place, I propose to divide the remaining two thirds of the moiety into fifty-seven shares, to be distributed among the several officers and crews of the salvor ships according to the following classification.

1. The first class includes the master and officers of the Hope and Padang.

| | | | | |
|---|---|---|---|---|
| Capt. Brewster is to take nine shares, | | | | 9 |
| Capt. Lister | " | six | " | 6 |
| Mr. Wheelwright | " | five | " | 5 |
| Mr. Metcalf | " | four | " | 4 |
| Mr. Weissell | " | three | " | 3 |

2. The second class includes all those persons belonging to the Hope, who were placed on board the Ewbank, and composed a part of her crew during the whole voyage. To each of these there are to be assigned two shares, namely:

| | | |
|---|---|---|
| To Watkins, | 2 | |
| Grace, | 2 | |
| Marshall, | 2 | |
| Duggin, | 2 | |
| | | 8 |

3. In the third class I place Turner, who was excluded from serving on board of the Ewbank contrary to his wishes, and to whom there are to be assigned two shares.    2    2

4. The fourth class includes the seamen of the Padang, who navigated the Ewbank into port, and to each of these I assign one share and a half, namely:

| | | |
|---|---|---|
| To Eldridge, | 1½ | |
| Hilyer, | 1½ | |
| Betts, | 1½ | |
| | | 4½ |

And I assign a like proportion to Hough, the carpenter, for his meritorious services, and the peculiar circumstances under which he went on board of the Padang; having been very efficient, as one of the original salving crew, namely:    1½      1½

5. The next class includes those of the crew of the Padang, who remained on board of her. To each of these there is assigned one share, namely:

| | | |
|---|---|---|
| To Miller, | 1 | |
| Hatch, | 1 | |
| Dale, | 1 | |
| Barrett, | 1 | |
| | | 4 |

6. The next class includes those of the original salving crew of the Hope, who left the Ewbank, and went on board the Padang. To each of these there is assigned one share, namely:

| | | |
|---|---|---|
| To James, | 1 | |
| Lyman, | 1 | |
| Cornish, | 1 | |
| Smith, | 1 | |
| | | 4 |

7. The next and last class includes the crew of the Hope who remained on board of her. To each of them (in all nine in number) there are assigned two thirds of one share, namely:

| | | |
|---|---|---|
| To Walker, | $\frac{2}{3}$ | |
| Oliphant, | $\frac{2}{3}$ | |
| Addison, | $\frac{2}{3}$ | |
| Graves, | $\frac{2}{3}$ | |
| Jones, | $\frac{2}{3}$ | |
| Lord, | $\frac{2}{3}$ | |
| Mitburn, | $\frac{2}{3}$ | |
| Love, | $\frac{2}{3}$ | |
| Skinner, | $\frac{2}{3}$ | |
| | $\frac{18}{3}$ = 6 shares | 6 |

shares 57

It will be perceived, from the manner in which I have viewed the general merits of the cause, that it has been wholly unnecessary for me to enter upon a minute examination of the great mass of conflicting testimony, as to the comparative merits or demerits of individual salvors. That there is much in this testimony, which is utterly irreconcilable, must be admitted; and on that account I rejoice, that it has not become my duty on this occasion to weigh in minute scales the credibility of those portions of it, which present the most distressing conflicts. All the testimony comes from parties in interest; and therefore partakes of the common infirmities of prejudice, suspicion, and feeling, which belong to evidence originating in such sources. Salvage cases constitute one of the class of excepted cases from the ordinary rule of evidence, by which a party is not permitted to testify in his own cause. But the exception arises from the very necessity of trusting to that, or of being left without proof; for in many cases no other persons exist, who can testify to the facts. A mere formal release

would not in substance vary the legal credibility of such testimony, whatever it might do as to its competency. Salvors, then, are ex necessitate admitted as witnesses to all facts, which are deemed peculiarly or exclusively within their knowledge. To other facts they are incompetent. But the very necessity of such a resort creates in many cases, from rival interests, and jealousies, and passions, a sad discoloration of the facts. In the struggle for victory, amidst the dust and eagerness of the race, each becomes intent for himself, and indifferent to others. So that the unwelcome duty is often imposed upon the court, to trust little to individual statements of minute facts, and much to the general aspect of the facts, as gathered from the res gestae. In salvage cases, above all others, it becomes the duty of the court to place its decrees far more upon the general merits of all, than upon the professed merits of a few. There is also sound policy in it; inasmuch as it has some tendency to mitigate the unavoidable virulence of personal comparisons; and to bring into common bonds of peace and union those, who would otherwise join in the common adventure with a warm and generous gallantry, and then quarrel ad internecionem about the division of the booty. But, although I have not found myself called upon to comment at large upon the conflict in the evidence, I can bear the most ready testimony, that it has been examined by the counsel on all sides with a diligence and ability worthy of the highest praise.

It remains for me only to say a few words upon the subject of costs. And, I think, taking into consideration, how much of the evidence bears solely upon the merits of the particular salvors, without any reference to the general amount of salvage, that it would not be correct to make the costs and expenses in the district court an equal charge upon the whole proceeds of the Ewbank and cargo, the effect of which would be to make the owners of them pay a full moiety. It appears to me, that it will be more just to charge the moiety given to the salvors with three fifths of those costs and expenses, and to charge the remaining two fifths on the other moiety. The costs of all the parties salvors in this court are to be deemed exclusively a charge upon the moiety awarded to the salvors. The claimants, (the Charleston Fire and Marine Insurance Company,) are entitled to their costs in this court, the decree of the district court not having been varied as to them. These costs are of course to be a charge upon the moiety awarded to the salvors.

I have thus gone over all the grounds of this cause, and I conclude by remarking, that I shall refer it to the clerk to ascertain and report the amount of salvage due to each party, according to the principles of this decree, after deducting all the costs, charges, and expenses.