## Case No. 7,345.

The JOHN GILPIN.

[Olcott, 77.] [1]

District Court, S. D. New York. April, 1845.

[1] [Reported by Edward R. Olcott, Esq.]

D. Lord, Jr., for libellants.
Griffin & Bidwell, for claimants.

BETTS, District Judge. This is a cause of salvage. The material facts are as follows: The brig, in attempting to go to sea on the afternoon of the first of January, 1841, grounded on the outer middle, in the harbor, below the Narrows, and from one to two miles off shore. It was then snowing, and the wind blowing heavily from the northeast. A boat's crew was sent off from the brig to Staten Island, to obtain a lighter, and in her absence every effort was made on board, and with the aid of the steamboat Osiris, to draw her off the bank, but without success. It was near night when the boat returned to the brig, and a lighter came down about the same time; but the brig was then bilged, her masts had worked loose in their steps, and the master supposed they must go overboard. Water was in the hold and cabin, and the ship's company were exposed to the storm and sea on deck, while the vessel was so careened as to render it difficult to maintain a standing upon her. The master, pilot and brig's company left her in the lighter, without attempting to take out of her the valuables on board at all, more than a part of their clothing. The storm and wind was then increasing, and the master of the lighter declared it unsafe for his vessel to remain out and near the vessel during the night. He returned to Staten Island, with her, taking the two mates and one or two of the men. The master, with the rest of the crew, went up to the city in a steamboat, which was met coming down to their relief. The time at which the lighter arrived at the island is not clearly stated, but most probably it was between 7 and 8 p. m. Some of the witnesses supposed it was later. The same evening, and within an hour after her arrival, the libellants put off for the wreck. The storm was still severe and unabated, but the wind was beginning to bear round to the northwest. The libellants are wreckers, and keep a vessel and crew in readiness to go out during the winter to the aid of vessels requiring assistance in the harbor and off the coast.

The claimants allege that the master of the first lighter, the Hiram Dixon, was em-

ployed by the master of the brig to return immediately to her with his lighter, and keep by the wreck until assistance could be sent down from the city by the owners. There is great conflict of testimony upon this point, but I find the preponderance of evidence to be, that no such engagement was entered into. The Hiram Dixon, on her return, had discharged all the duties she was engaged to perform in respect to the wreck. I do not, therefore, discover any foundation for the charge, that a fraudulent arrangement or confederation was entered into between the libellants and the master, or any of the crew of the Hiram Dixon, or that the libellants went down to the vessel and surreptitiously took possession of her with intent to supplant her master and owners in giving her relief. Even had the asserted engagement with the Hiram Dixon been proved, such an arrangement could not well be made a continuing possession of the brig, so as to oust, or extinguish all right of the libellants to hold her as salvors, having gone aboard and taken charge of her in the perilous condition in which she was found. It is to be observed it was then mid-winter, at the height of a northeast storm of wind and snow, in the night time, and that the brig lay at a point most exposed to danger from the wind and waves coming upon her from that direction, and that there was every probability she must be immediately broken up, causing the loss of every thing on board. She was apparently abandoned, and if her crew might have been absent to procure assistance from other vessels and more force, their ability to return to the wreck or the chance of affording any aid after the lapse of a few hours, must, in the then condition of things, have been most dubious contingencies.

The libellants, in the exercise of their calling as wreckers, coming to a vessel in that plight, would be guilty of a dereliction of duty if they failed to employ all their means for the instantaneous preservation of property so circumstanced. This may not be strictly and technically a case of derelict—Clarke v. The Dodge Healy [Case No. 2,-849],—if really the master of the brig had gone to the city to obtain the necessary help to save the cargo and brig, intending, at the time, to return with all practicable dispatch. It appears he came to the wreck by 8 or 9 a. m. the following day, in a steam-tug, with men to assist in saving the cargo. The animus revertendi et recuperandi may thus far have continued with the master, but this mental hope or purpose must be regarded inoperative and unavailing as an actual occupancy of the vessel, or manifestation to others of a continuing possession. She was absolutely deserted for 12 or 14 hours in a condition when her instant destruction was menaced, and the lives of those who should attempt to remain by her would be considered in highest jeopardy. She was quite derelict; and being thus found (The Boston [Id. 1,673]; Rowe v. The Brig [Id. 12,093]; 1 Sir Lionel Jenkins, 89) by the libellants, the possession they took of her was lawful (The Emulous [Case No. 4,480]).

Possession being thus taken when the vessel was, in fact, abandoned and quite derelict, under peril of instant destruction, the libellants had a right to retain it until the salvage was completed, and no other person could interfere against them forcibly, provided they were able to effect the purpose, and were conducting the business with fidelity and vigor. Abb. Shipp. 554; Holt, Shipp. 522; Edw. Adm. 175; 3 Hagg. Adm. 159, 160, 161; Id. 167, 243, 385. The argument, that the brig not having been out to sea when wrecked, varied the relation of the parties, has no foundation in law or reason. The exigency was no less imminent that immediate relief should be afforded her; nor have merchants and underwriters a less interest that prompt and efficacious assistance be rendered vessels imperiled in great bays and roadsteads, than if they happen to be outside a harbor; and that the stimulant, inducing aid, be applied, by constituting those who render it, salvors. The doctrine is clear in this country that salvage compensation may be obtained in admiralty for services rendered within the ebb and flow of the tide, without regard to location, whether on the high seas, or inter fauces terræ. The Emulous and The Boston [supra]; American Ins. Co. v. Canter, 1 Pet. [26 U. S.] 511; Hobart v. Drogan, 10 Pet. [35 U. S.] 108; U. S. v. Coombs, 12 Pet. [37 U. S.] 72. And there is no apparent reason why the rule should be restricted to tide waters, and not embrace all navigable waters out of the jurisdiction of any particular state. This principle would seem to bring the common law "wreck of the sea," if found within high water mark on shore, within the privilege of the law of salvage. 1 Pet. [26 U. S.] and 12 Pet. [37 U. S], before cited. The English rule is not in conflict with the American (The Euraces; [The Frederick] 1 W. Rob. Adm. 16; The Westminster, Id. 229; Id. 172), except perhaps, in the particular of the wreck of the sea (The Augusta, 1 Hagg. Adm. 17; Holt, Shipp. 522). Justice Story, commenting upon this distinction, in U. S. v. Coombs, says: "It is true that it has been said that the admiralty has not jurisdiction of the wreck of the sea. 3 Bl. Comm. 106, 107. But we are to understand by this, not what, in the sense of the maritime and commercial law, is deemed wreck or shipwrecked property, but 'wreck of the sea,' in the purely technical sense of the common law. A passage has been sometimes relied on, in one of the earliest judgments of Lord Stowell, the case of The Two Friends. 1 C. Rob. Adm. 271, in which it is intimated that if the goods, which are subject to salvage, have been landed before the process of the admiralty court has been served upon them, the jurisdiction over

them, for the purpose of salvage, may be gone. The supposed difficulty in that case was not that the court had not jurisdiction; but that in cases of salvage on the instance side of the court, no process of the court could be served on land, but only on the water. This exception is inapplicable to the courts of the United States, where admiralty process, both on the instance and prize side of the court, can be served on land as well as on water." Had the crew of the brig been in sight in a boat, or on shore, after abandoning the vessel, and evincing no intention to return, and being unable to relieve her, those who should come to the rescue of vessel or cargo, would acquire the rights and privileges of salvors.

The evidence shows that the libellants, after falling in with the wreck, applied all the means and diligence within their power, and which the circumstances of the case admitted, in saving the property. It further appears that Roff, the master of the salving vessel, was skilled in this business; is a man of energy, and that he not only exerted whatever means he possessed, but engaged men and vessels to aid him wherever they could be advantageously employed. Whilst so engaged, the master of the brig returned to her, and demanded the possession to be surrendered to him. The libellants refused compliance with the demand, asserting that they were legally in possession of the brig as salvors, and should retain it in that character. Roff said he had found her there stranded and deserted, no one being with her or keeping guard of her, and he intended to hold her, and save the cargo. Henry Dixon testifies that he went down to the brig about 9 o'clock, with her master, in the steam-tug Hercules, who went aboard with the witness; told him that the brig was in charge of the wreckers, and witness must make arrangement with Roff, and go to work stripping her. Roff hired the riggers brought down by the master, and employed them to help dismantle the brig. The master would have no rightful authority, on such facts, without tender of a full satisfaction to the libellants, to exact the surrender of the vessel to him, she being aground and helpless, and not in a salved state, or capable of being restored to the owners; and the facts abundantly show, that the change of possession could not have been then made without involving the probable loss of vessel and cargo. The master, with his crew, left the brig under the belief that she must go to pieces that night; he gave no intimation of returning to her; she lay in a perilous position, on her beam ends, filled with water to her hatches, and the sea making a breach over her. The storm continued raging that night, and the sea was so rough that it was impracticable for any other craft than small vessels to be brought alongside, or made useful to

the brig or her cargo. The master had come down in a steam-tug, without lighters, to aid in unlading the cargo; and all the testimony shows that no effective assistance could have been rendered the wreck, except by such lighters, nor was it intended to use the tug for any further purpose than to bring the master and his few attendants to the wreck.

In the afternoon, an agent for the owners came to the brig in a steam-tug, with men engaged to assist in saving the cargo, and demanded possession of her from the libellants. This demand, as before, was disregarded, but Roff declared his willingness to employ the men brought down, if they would work, and did engage all who consented to stay with him. At the close of that day, Roff was arrested under the directions of the owners, by a deputy marshal of the United States, and taken forcibly from the wreck to the city, and the agent took possession of the wreck for the owners, turning the libellants out of her. The warrant was obtained on a charge of larceny, committed by Roff, on board the wreck. The agents of the owners and underwriters, after the dispossession of the libellants, conducted operations for saving the cargo, until the brig, four days afterwards, went to pieces, and was totally lost. It is not necessary to determine whether, if the vessel had been afloat, and being brought into port, the law would have entitled her owners to possession, to the exclusion of the salvors, to complete the salvage themselves; and if so, on what terms or conditions; because here, most probably, the vessel could not be surrendered to them as saved, nor was the interposition of the owners necessary for the rescue of the property. The result proved they were unable to effect it. The dispossession of the libellants, then, in successful operation, was, under the facts, clearly wrongful; and in respect to Roff, accompanied with circumstances of extreme aggravation. No justification is shown for his arrest on a criminal charge. It was manifestly employed to make him give up the brig, and the proceeding was dropped so soon as his removal was accomplished. The unquestionable responsibility of the owners and underwriters imparted no privilege to them in respect to the salvors, which could not be claimed by strangers or owners, without responsibility; and, in my opinion, they had no authority to force the vessel and cargo out of the possession of the salvors, without making or tendering them full remuneration for the services already performed by them. The court cannot, however, act upon that proceeding as ground for damages or otherwise, in so far as the false imprisonment or tortious arrest of Roff is concerned. The remedy for that wrong must be sought elsewhere; but it is in consonance with the established principles of

maritime law to hold those. beginning a salvage service, and who are in the successful prosecution of it, entitled to be regarded as the meritorious salvors of whatever is preserved, and entitled to the sole possession of the property (1 Ld. Raym. 393; 2 H. .Bl. 294; 1 Saund. 265; 8 East, 57; 1 Dod. 417; 2 Hagg. Adm. 361; 3 Hagg. Adm. 160, 167, 243; Edw. Adm. 175); and the same would seem to follow, even if they have been wrongfully interrupted or intercepted in the work by others, who complete the salvage, and bring in the salved property.

It does not become necessary, in this case, to consider minutely the course of conduct pursued on board after the libellants were dispossessed, because the amount of property saved furnishes adequate means for compensating them; but the testimony seems to call for the remark from the court, that owners and underwriters would undoubtedly have been large gainers had the business been left in the hands of the first salvors. A great parade of force was made, and an enormous outlay of charges incurred, and yet the amount saved in the four days the wreck was under their charge, holds no corresponding proportion in favor of the owners to the beneficial services rendered by the libellants. The libellants were quietly, but most efficiently employed; they were industrious, untiring and fearless, and thor-. oughly acquainted with the duties required of them. They had shipped and saved the rigging of the brig, loaded and dispatched one lighter, and half filled a second, before the arrest of Roff; and their enterprise promised a speedy and successful result.

In the account of sales of the property the owners do not fully discriminate between that saved by the libellants, and that sent up by those succeeding them. They credit the proceeds of property saved by Roff at $5,494 85, but the rigging and materials are not included, and out of $9,205 32, the proceeds of the cargo put on board the lighter (W. S. Rost), only $1,058 65 are credited to Roff. The evidence affords strong ground in support of the claim of the libellants, that the latter vessel was half laden by them; and if the $2,253 26 credited to materials, be the sails, rigging, &c., of the wreck, they belong also to the credit of the libellants. If the account is stated upon their allowances, then of the whole sum of sales, $42,495 78, $11.294 07 would be rightfully claimed by the libellants as the amount of the property saved by them. But this view of the case is not pressed, nor are the facts investigated with the intent to adjust fully the rights or equities that might attach, in favor of the libellants, to them; for whether the salvage service has been best performed by the one or the other set of salvors, could not vary the right of the libellants to their just compensation. and the amount restored to the owners by the different salvors affords ample means of remuneration to the libellants.

This is not a case for extravagant compensation, although the services were well timed, faithful, and beneficial, and involved risks and fatigues beyond that of ordinary labor, and outrank a mere quantum meruit reward (The Hector, 3 Hagg. Adm. 90, 95; Id. 120, 121; Id. 204, 205), yet they are not entitled to be placed in the highest order of perils and salvage services. Still more than the actual toil and expenses are to be considered in view of the imminent contingency that their efforts might be unavailing by the breaking up of the vessel before any amount of property could be rescued. Under similar hazards, the English admiralty awarded a liberal compensation for services in themselves attended with little danger or exposure. The Westminster, 1 W. Rob. Adm. 229. The imputations of embezzlement are not supported. The conduct of the libellants was unexceptionable, and is deserving a liberal consideration. If the amount of property saved by all had been small, I should apportion their compensation upon the aggregate so rescued from loss and destruction, regarding the libellants as equitably, and, according to the rules of maritime law, entitled to a reward for that brought in by those who supplanted them. But in the view I take of the evidence, it appears that the libellants got out of the wreck her materials, the full lading by the Alice Ellis, and one-half of the lading of the W. S. Rost, which, according to the account of sales rendered by the owners, produced $11,294 07.

I decree that the libellants recover one-fifth of this sum, being $2,258 81, and their costs to be taxed.