TWENTY-SIX CASES OF RUBBER BOOTS (UNITED STATES v.). See Case No. 16,571.

TWENTY-SIX DIAMOND RINGS (UNITED STATES v.). See Case No. 16,572.

---

## Case No. 14,284.

TWENTY-THREE BALES OF COTTON.

[9 Ben. 48.] [1]

District Court, E. D. New York.    March, 1877.

SALVAGE—DERELICT PROPERTY.

Where a deck-load of cotton in bales had been dumped from a lighter, and part of it floated away with the tide, in the bay of New York, and next morning a tug, seeing the cotton floating near the Narrows, put out with a lighter and secured twenty-three bales, at some risk and with some damage to the vessels from ice, held, that the service was a salvage service; that the circumstances warranted the belief that the property was abandoned, notwithstanding the appearance of another tug, claiming to be sent by the owners to pick up the cotton; and that the salvors had not forfeited their right to compensation by refusing to surrender the cotton to the persons demanding it, nor by promptly libelling it to recover the salvage.

[Cited in Cope v. Vallette Dry Dock, 10 Fed. 145.]

This action was for salvage service, performed in picking up cotton bales floating in New York harbor.

Beebe, Wilcox & Hobbs, for libelants.

C. E. Crowell, for claimants.

BENEDICT, District Judge. This is an action brought to obtain at the hands of the court an award of salvage for services rendered in respect to twenty-three bales of cotton. The action has been hotly contested, and evidently a state of feeling has grown up between the parties that has rendered necessary the adjudication of a demand which, under other circumstances, would have been easily adjusted by the parties themselves. The feeling alluded to impels me to give the case a more extended examination than either the amount or the questions of law involved would ordinarily call for. The material facts disclosed by the evidence are as follows:

On the 10th of January, 1877, just at nightfall, a barge lying at the American docks, Staten Island, laden with cotton bales, then in the possession of the National Freight and Lighterage Company as common carriers, was caught by floating ice and thereby careened so that she dumped some five hundred bales of cotton into the slip. The weather was cold, the tide was running ebb, there

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

was much ice in the bay and night was at hand. The manager of the National Freight and Lighterage Company upon being informed of the mishap at once dispatched the tug C. A. Sumner, the steam lighter Watson, and another lighter, with an extra force of thirty-five men from New York, to secure the cotton. This force having proceeded to the scene of the disaster, boats were at once placed across the mouth of the slip to prevent the cotton then remaining in the slip from being carried out by the tide, while the men began to hoist out cotton from the water. They were engaged at this labor all the night and until about 11 a. m. the next day, when all of the cotton was secured except forty bales that had been carried out of the slip by the tide before the arrival of assistance. The cotton that had so escaped was left drifting about the bay with the heavy ice then moving on the tide. About 9 a. m., the master of the tug Harlow Bailey, in the employ of the Peerless Oil Works, a large oil refinery at the foot of 25th street, Gowanus, reported to Mr. Bush, one of his owners, that cotton bales were floating in the bay. Bush at once directed the lighter Susan and Rebecca to be taken in tow by the Harlow Bailey, and going on board the tug himself, with an extra man or two, making ten in all, proceeded out into the bay for the purpose of saving the cotton. The weather was still cold, the bay was full of ice. the tide was running ebb, the cotton had floated down towards the Narrows, and was then some three miles distant, and no other vessel of any description was to be seen, except a lighter over by Staten Island, in distress from the ice. The Harlow Bailey, with the lighter in tow, proceeded to the cotton, and, about half-past ten a. m., began to secure it. After a bale or two had been secured it seemed probable that some of the cotton would pass the Narrows before all could be secured, whereupon the lighter and tug proceeded directly to the Narrows, and then, turning, worked back, picking up the cotton as they found it in the ice. The mode of operating was to tow the lighter into the ice, alongside of each bale as found, and when the bale was alongside a man jumped on and fastened it in a sling. It was then hoisted on board the lighter. In this way, by 12 o'clock, all the cotton that could be found, except two bales, had been secured; and the tug and lighter, having 23 bales on board, were about completing the work when the Watson overhauled them, and those on board the Watson demanded the cotton, at the same time informing the salvors that they would get pay for their services at the American docks whence the cotton had escaped. The salvors declined to surrender the 23 bales they had secured, and declined to carry the cotton to the American docks, but proceeded with it to the libellants' wharf, at the foot. of 25th street, whence they had started. The whole time occupied in the service was about three and a half hours. In the performance of the service the lighter Susan and Rebecca was stove by the ice, and was only kept afloat by placing a man in her hold at the break through which water was pouring in a stream, who, by constantly forcing cotton into the break, made out to stay the water so that the lighter was kept afloat. She ran great risk of loss, however, and was in a sinking condition when she reached her dock. The man in her hold was so chilled as to require assistance to get him ashore. On the same day this action was commenced to recover salvage for the service in saving the 23 bales thus secured. The demand is contested by the National Freight and Lighterage Company who have filed a claim to the cotton.

First, it is said the cotton was not abandoned, no request was made for the libellants to secure it, and without their assistance it would have been secured in due time by those in whose charge it was when it was dumped. The evidence shows that directions had been given to the tug Watson, to proceed to the Narrows as soon as all the cotton in the slip should be secured, and to search the Staten Island shore for cotton that might have drifted in upon that shore. After this she was to pick up any cotton that could be found in the bay. This instruction was obeyed, but the Watson was unable to get out until after the Harbor Bailey had begun to secure the cotton. When the Watson did get out, although the Bailey was seen to be picking up cotton, no signal was made to her but she was permitted to continue her labor on the Long Island shore, while the Watson, as directed, went down the Staten Island shore to the Narrows in the clear water. No communication was had between the tugs until 23 bales had been secured by the Harlow Bailey in the manner above described and the Bailey was well on her way back. This evidence shows that in determining the amount of salvage to be awarded the cotton cannot be considered a derelict; but it also shows that a salvage service has been performed. The cotton had been floating all night and a part of a day in the open bay when the service was performed. The service was undertaken when no one was endeavoring to save the cotton. When the service was seen to have been undertaken by the libellants no objection of any kind was made, nor any effort put forth to make known that the Watson was intending to pick up the cotton. It was not until after the service had been performed that any claim of right in the property was asserted by the lighterage company. These circumstances gave to any person the right to endeavor to save the property. The absence of an affirmative request of the service is not a material circumstance.

The presence of the Watson when she appeared upon the scene is a fact to be considered in determining the extent of the danger to which the cotton was exposed, but neither her presence nor her actions under

the circumstances prevented the rendition of a salvage service to the cotton. This is not a case of intrusion by persons desiring to force their services upon unwilling parties in distress. If such had been the fact, the court would look upon the libellants' claim with no favorable eye. The case here is one where parties, under no obligation to do so, voluntarily put out for the sole purpose of rescuing property floating about the bay, having no person near it, and there being no indication that any persons were intending to save it. It is a clear case of salvage, then, if the property was in danger. The claimants deny that there was any danger of losing the cotton, as it would float, and, as they believe, would not have passed out to sea upon that tide. But the acts of both the tugs show that danger was apprehended, if the cotton should pass the Narrows, for both the tugs proceeded at once to the Narrows to prevent such an occurrence. It is plain, too, that there was constant danger that some of the bales might be carried under the ice, and so wholly lost, and what is conclusive evidence of a real danger is the fact that, although every bale found was picked up, of the 41 bales that passed out of the slip 16 were actually lost. I find then in the case all the elements of a salvage service.

But it is further contended in behalf of the defence that the salvors were guilty of misconduct and forfeited all right to compensation by refusing either to surrender the cotton when the Watson came to them for it or to carry it to the American stores whence they were informed it came. I find no misconduct in these acts of the salvors. Having performed a salvage service they had acquired the right of possession, and any right of the claimants was for the time being subject to this right of the salvors. Besides, how could the salvors know that the parties claiming the cotton had any right whatever in the same? Acts of salvors in maintaining their right of possession, to the injury of other parties and without reason therefor, are not to be approved; but no such acts appear in this case. The tug and lighter having the cotton were well known to those demanding the cotton. The salvors and their vessels could at any time be found. There was no attempt to conceal or make away with the property. The place to which they were known to be taking the property was within sight of the place where the claimants desired to have it. No extra risk or charge was incurred and the refusal to surrender the cotton in accordance with the demand of those on the Watson does not afford ground for criticism. The good faith of the salvors is shown by the fact that when the Watson came up with parties who asserted that the cotton had escaped from their custody, no effort was made on the part of the salvors to secure the two bales that had already been discovered by them but not secured, and the locality of those bales was pointed out to the demandants in order that they might secure those bales themselves; and in this connection it may be noticed that after securing one of the bales thus pointed out the Watson did not think it advisable to continue her efforts but waited until the next day, when she resumed search for the missing bales.

Again, great complaint is made against the salvors because they filed their libel so promptly and when they knew that the claimants were willing to pay a reasonable compensation for the services performed. The fact proved that on the same day the cotton was picked up, the claimants procured a search warrant from a court of the state and also a warrant to arrest the master of the lighter for conversion of the property, warrants the inference that the filing of the libel may have been hastened by the attitude assumed towards the salvors by the agent of the claimants, who says, "I thought I should be ahead of them and I got a search warrant to take the cotton from them." But however this may be, the prompt filing of the libel caused no detriment to the owners of the property, but on the contrary enabled them the sooner to re-acquire the possession of it upon giving a stipulation for value as was done. There is no reason to suppose that the action of the libellants arose from a desire to incur expense or to make costs unnecessarily. Furthermore it is to be noticed, that although the manager of the lighterage company after the libel had been filed said that he would do what was right, and in vain attempted to have the salvors name the amount of their demand, still no definite sum was ever offered or suggested by the agent and no tender has ever been plead or made; while the proof shows that when he found a libel had been filed, he said that as a suit had been brought he would not pay a cent until compelled to. The defence made has been in harmony with this statement.

These conclusions compel a determination of this case in favor of the libellants, and there remains but to determine the amount of their reward. The value of the cotton saved is $1,150. The time employed was about three hours. The risk of total loss of the 23 bales saved was greatly diminished by the presence of the Watson after she was able to leave the work in the slip. The lighter, worth some $5,000, was used at considerable risk of her being sunk by the ice. The salvors put out from a safe harbor for the sole purpose of saving property apparently derelict. The value of the property saved is small and the award is to be divided among nine persons besides the owners of the tug and lighter. The owners of the lighter have expended $44.55 in repairing the injuries sustained by the lighter while performing the service. In view of all the circumstances, I shall fix the salvage at one-third the value of the property saved. This sum the libellants are entitled to recover, and as there has been no tender they must also recover their costs.