### COPE and others *v.* VALLETTE DRY-DOCK.[*]

(*District Court, E. D. Louisiana.* January 3, 1882.)

1. ADMIRALTY AND MARITIME JURISDICTION.
    This jurisdiction, so far as relates to subject-matter, means that jurisdiction which had been and was being exercised in admiralty in this country prior to and at the adoption of the constitution, and with reference to locality, comprises the navigable waters of the nation, as well as the high seas.

2. SAME—SALVAGE—DRY-DOCK.
    A claim for the salvage of a dry-dock—a floating dock capable of elevation or depression in the water by means of pumping water in or out, designed and used to be sunk under vessels, and then pumped out so as to become dry, leaving the enclosed vessel in a position to be inspected and repaired, and incapable of self-propulsion, not capable of being used for any purpose of navigation, and permanently moored in the Mississippi river by means of enormous chains —is not within the admiralty and maritime jurisdiction of the courts of the United States.

Action *in rem* for salvage. The libel alleged that the Vallette dry-dock, lying in New Orleans, on the right bank of the Mississippi river,

*Reported by Joseph P. Hornor, Esq., of the New Orleans bar.
See same case on appeal, 16 Fed. Rep. 924.

was run into by a steam-ship that was about leaving port, and was considerably damaged and left in great danger of sinking. The steam-tugs of libellant and others came and rendered assistance by pumping, which saved the dry-dock, and they were therefore entitled to salvage.

*Chas. S. Rice* and *J. R. Beckwith,* for libellants and intervenors.

*M. M. Cohen,* for claimants.

BILLINGS, D. J. This case has been heard upon a plea to the jurisdiction. The question submitted is whether the thing libelled is of such a nature or character as to make it subject to a claim for salvage in the sense in which that word is used in admiralty.

The subject of this libel is a dry-dock—a floating dock susceptible of elevation or depression in the water by means of pumping the water out or in. Its design and use is to be sunk under a vessel and then to be pumped out so as to become dry, leaving the vessel in a position to be inspected and repaired. It is incapable of self-propulsion, cannot be propelled except when towed, has no capacity to be used for any purpose of navigation, and was permanently moored in the Mississippi river, by means of enormous chains, at a point opposite the city of New Orleans. The libel alleges the dock had been run into, was sinking, and was saved.

The question turns entirely upon the meaning of the expression "admiralty and maritime jurisdiction" in the provision of the constitution of the United States (article 2, § 3) which creates the judicial power, and in the ninth section of the judiciary act of 1789, which delegates that power to the district courts.

It has been laid down by Chancellor Kent and Justice Story, and is affirmed by the supreme court in *Ins. Co.* v. *Dunham,* 11 Wall. 1, and *Ex parte Easton,* 95 U. S. 68, that this jurisdiction means that jurisdiction which had been and was being exercised in admiralty in this country prior to and at the time of the adoption of the constitution, and not the jurisdiction of England nor that of continental Europe. So far as extent of locality is concerned, in the courts of the United States, it comprises the navigable waters of the nation, as well as the high seas.

As to what was included within this jurisdiction, my own opinion is that we can most safely look to the commissions of the judges in admiralty before and at the time of the revolution. A number of these commissions are given *in extenso* in Ben. Adm. *c.* 9. These commissions show what contracts are included in that jurisdiction,

namely, charter-parties, bills of lading, policies of insurance, etc.; they show that locally it included the sea, public streams, etc.; what torts were included within it; and, lastly, what can be the subject-matter of salvage; for, besides everything pertaining directly to a ship, or things used in navigation, they add, "and also of and concerning all casualties at sea, goods wrecked, flotsam, jetsam, lagon, shares, things 'cast overboard, and wreck of the sea, and all things taken or to be taken as derelict or by chance found or to be found."

If one was most laboriously to prepare from all the admiralty cases which have been acquiesced in, an enumeration of the things which can be subjected to a claim for salvage, it could scarcely be more exact. It is to be seen that it includes the vessel or ship, wrecked goods, goods which float away or are cast away or which sink from the ship, and to this enumeration are added derelict things, and things found, i. e., abandoned.

The reason of this precise discrimination is that with the exception of derelict and things found, and the ship, her cargo, and freight, there could be no basis in reason for a lien which must exist in order to support a libel *in rem*. The ship and all things which pertain to it, are, in the law of admiralty, clothed with personalty, so far as responsibility goes. Those who repair or loan upon her, or equip or man her, and those who deal with her, and those who are injured by her, and those who save her, look to her. The reason of this is that she was often far distant from her home and owners, and commerce was vastly facilitated by the law thus endowing her with the attributes of a person. This is the origin of the doctrine of liens in the maritime law, and by this it is to be measured—so measured, in cases of salvage, it included the ship's apparel, tackle, money, freight, cargo; and here it stopped, for the necessities of commerce did not require that anything else should be clothed with, so to speak, capacity to subject itself to pecuniary responsibility. The salvage allowed derelict and "found" property, from a different reason, namely, as an incentive to save property abandoned to destruction from the elements upon the broad ocean.

I think the commissions of the colonial admiralty judges, a study of the cases which have arisen in our admiralty jurisprudence, and the fact that salvage is allowed only in connection with commerce, all lead to the recognition of this test as being the true one. Judged by it, the object here libelled, the dry-dock, is not the subject of admiralty or maritime jurisdiction for salvage.

This manner of arriving at a solution of the question before the court renders it unnecessary to comment upon the cases which have been cited, further than to say that in all the cases decided by courts of the United States where salvage has been allowed, the property saved was either the ship, her cargo and freight, or derelict property, or property abandoned upon the navigable waters, and in all the cases where it has been disallowed the property saved was neither. I except the case of *Four Cribs of Spars*, Taney, 533, where the usages of the lumber business seem to have controlled the court.

See *The Hendrick Hudson*, 3 Ben. 419; *Salvor Wrecking Co.* v. *Sectional Dry-dock Co.* 3 Cent. Law J. 640; *Thackeray* v. *The Farmer*, Gilpin, 524; *The Belfast*, 7 Wall. 637; 1 Conkling, Adm. 8; *50,000 Feet of Lumber*, 2 Low. 64; *A Raft of Spars*, 1 Abb. Adm. 485; *23 Bales of Cotton*, 9 Ben. 48.

The plea to the jurisdiction is maintained, and the libel dismissed.