**R.M.S. TITANIC, INC., successor in interest to Titanic Ventures, limited partnership, Plaintiff,**

v.

**THE WRECKED AND ABANDONED VESSEL, its engines, tackle, apparel, appurtenances, cargo, etc., Located within one (1) nautical mile of a point located at 41° 43′ 32″ North Latitude and 49° 56′ 49″ West Longitude, believed to be the R.M.S. TITANIC, in rem, Defendant.**

No. 2:93cv902.

United States District Court,
E.D. Virginia,
Norfolk Division.

June 23, 1998.

---

Mark Steven Davis, Fred Bradford Still-man, McGuire, Woods, Battle & Boothe, Nor-folk, for Plaintiff.

Alex Blanton, Michael Joseph, Joseph O. Click, Dyer Ellis & Joseph, Watergate, Washington, DC, Ann Katherine Sullivan, Guilford D. Ware, Crenshaw, Ware & Mar-tin, Norfolk, for Defendant.

CLARKE, District Judge.

## OPINION AND ORDER

This matter is before the Court on motion of R.M.S. Titanic, Inc. (RMST), acting as

salvor in possession of Defendant wreck, for a preliminary injunction enjoining certain parties from visiting the wreck site to view and photograph the wreck. Since the Court has previously held that RMST's salvor in possession rights include the exclusive right to regulate access to the wreck site and photograph the wreck itself, the motion is essentially a request that the previous orders entered in this case be personalized and enforced against the new parties RMST seeks to enjoin. RMST's motion is granted.

## I.

### A.

RMST filed a Verified Complaint on August 26, 1993 requesting, among other things, an *in rem* arrest of the wreck of the R.M.S. TITANIC and that it be awarded the sole and exclusive salvage rights for the wreck. At a hearing held on August 27, 1993, RMST presented to the Court a wine decanter salvaged from the R.M.S. TITANIC wreck. *See* Transcript at 6 (Aug. 27, 1993). At that time numerous other artifacts were also within the judicial district. *See id.* By Order entered August 27, 1993, the Court found that "portions of the *in rem* Defendant are or shortly will be within this district during the pendency of this action . . . ." Order for Issuance of Warrant of Arrest at 1–2 (Aug. 27, 1993). The Court ordered that the United States Marshal arrest the wreck and artifacts already salvaged from the wreck pursuant to Supplemental Admiralty Rule C(2).[1] *Id.* at 2. Also by Order entered August 27, 1993, the Court substituted RMST for the United States Marshal as custodian of the wreck, wreck site, and artifacts. *See* Order Appointing Substitute Custodian at 2–3 (Aug. 27, 1993).

In early September 1993, notice of the *in rem* arrest was provided to other potential salvors by publication in three newspapers—*The Virginian–Pilot, The Wall Street Journal,* and *The Journal of Commerce.* Liverpool and London Steamship Protection and Indemnity Association (Liverpool and London) was the only party to file a claim.

RMST and Liverpool and London subsequently entered into a settlement agreement, and the Court dismissed Liverpool and London's claim with prejudice on June 7, 1994. *See* Dismissal Order (June 7, 1994).

By separate Order entered June 7, 1994, the Court awarded RMST salvor in possession status over the wreck and artifacts from the wreck. In the Order, the Court notes that following the 1993 *in rem* arrest and publication only Liverpool and London filed a claim against the Defendant and that claim was dismissed. *See* Order at 1 (June 7, 1994). The Order also states that the Court

> FINDS AND ORDERS that [RMST] is the salvor in possession of the wreck and wreck site of the R.M.S. Titanic, including without limitation, the hull, machinery, engine, tackle, apparel, appurtenances, contents and cargo, and that [RMST] is the true, sole and exclusive owner of any items salvaged from the wreck of the defendant vessel in the past and, so long as [RMST] remains salvor in possession, items salvaged in the future, and is entitled to all salvage rights . . . .

*Id.* at 2. Concerning other potential claimants who failed to heed the notice provided in the publication announcement of the *in rem* action, the Court ordered "that default judgment is entered against all potential claimants who have not yet filed claims and such claims are therefore barred and precluded so long as [RMST] remains salvor in possession . . . ." *Id.*

### B.

In 1996, a competing salvor, John A. Joslyn, challenged RMST's status as salvor in possession. An evidentiary hearing was held from April 29 to May 1, 1996, at which the Court heard testimony and received evidence concerning RMST's salvage related activities.

By Order entered May 10, 1996, the Court reaffirmed RMST's status as salvor in possession. *See R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel,* 924 F.Supp. 714, 722–24 (E.D.Va.1996). Finding that RMST

---

**1.** The Marshal physically arrested the artifacts and served the arrest warrant for the wreck itself on RMST's president who had been appointed substitute custodian and was the salvor who had possession of the wreck at that time. *See* Process Receipt and Return (docketed Sept. 1, 1993).

had used due diligence in past salvage operations, planned ongoing and future salvage operations, and was clothed with the prospect of success in its salvage activities, the Court concluded that RMST "should remain the sole salvor in possession of the TITANIC wreck site . . . ." *Id.* at 724.

Joslyn then expressed an intention to visit the wreck site solely to photograph the wreck. On August 9, 1996, the Court issued a Temporary Restraining Order against Joslyn's planned photographic expedition to the wreck. *See* Order (Aug. 9, 1996), *amended by,* Amended Order (Aug. 13, 1996). The Order states:

> The Court is of the opinion that its Order of May 10, 1996, while it did not specifically forbid photographing the wreck or the wreck site by other than [RMST], it did express in specific terms the need for [RMST] to have jurisdiction over the wreck site. This would include determining who could enter the site for any purpose and who could photograph the ship and the locale.

*Id.* at 1–2. The Temporary Restraining Order was against Joslyn, Blackhawk Television, and the R/V AKADEMIC MSTISLAV KELDYSH. *Id.*

By Order entered August 13, 1996, the Court converted the Temporary Restraining Order into a Preliminary Injunction Order. Joslyn, Blackhawk Television, the R/V AKADEMIC MSTISLAV KELDYSH, and "any other person having notice of this Order" were enjoined from "conducting search, survey, salvage operations, or obtaining any image or photograph of the TITANIC wreck or wreck site." Order at 2 (Aug. 13, 1996).

In the August 13, 1996 Order, the Court also made a legal conclusion that RMST's rights as salvor in possession include the sole and exclusive right to photograph the wreck. The Court noted that "video sales, film documentaries, and television broadcasts [are] inventive marketing ideas that [RMST] must resort to since it is not selling the artifacts [and][i]t is clear that the presence of another in the marketplace would diminish the rights the Court has granted [RMST]." *Id.* at 3. The Court found that "in a case such as this, allowing another 'salvor' to take photographs of the wreck and wreck site is akin to allowing another salvor to physically invade the wreck and take artifacts themselves." *Id.* at 4. Thus, the Court concluded that since "photographs can be marketed like any other physical artifact . . . the rights to images, photographs, videos, and the like belong to [RMST]." *Id.* at 3.

Joslyn appealed the August 13, 1996 Preliminary Injunction Order to the Fourth Circuit Court of Appeals. The appeal was subsequently dismissed pursuant to a stipulation of dismissal filed by the parties. The Fourth Circuit "dismisse[d] th[e] appeal with prejudice pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure . . . ." Order at 3 (4th Cir. Dec. 6, 1996).

### C.

RMST's activities in salvaging the wreck have been commendable. Through its predecessor in interest and itself, RMST has conducted research and recovery expeditions at the wreck site in June 1987, June 1993, July 1994, and August 1996. It has current plans to conduct an expedition in August 1998. RMST has exhibited considerable zeal as salvor in possession despite the fact that salvaging the wreck is extremely time-consuming, dangerous, and expensive.

Salvaging the wreck of the R.M.S. TITANIC is time-consuming because it is impossible to conduct continuous, ongoing salvage operations at the wreck site. Year-round salvage operations are impossible "[b]ecause of weather conditions at the site" in the stormy North Atlantic Ocean. *R.M.S. Titanic, Inc.,* 924 F.Supp. at 716 n. 3. "[S]alvage operations are only feasible during the months of June, July, and August." *Id.; see* Order at 1 (Aug. 13, 1996) (stating that "[t]he weather window for operations at the salvage site is very short").

Salvaging the wreck is dangerous and expensive because of its depth. The wreck "lies two-and-a-half miles below the ocean surface and the use of a manned submersible is required to reach it." *R.M.S. Titanic, Inc.,* 924 F.Supp. at 722. "This type of salvage operation is highly speculative and the expedition costs are high." *Id.* at 717. Dur-

ing the Preliminary Injunction Hearing on May 27, 1998, George Tulloch, RMST's president, testified that just the cost to charter a vessel and submersible for the 1998 expedition is $1,460,000. Transcript at 34 (May 27, 1998). Moreover, any artifacts that are recovered must be properly preserved and conserved at great expense. *See R.M.S. Titanic, Inc.,* 924 F.Supp. at 717 (discussing French conservation laboratory's cost to preserve artifacts and other costs of salvage for 1996 expedition).

Despite these considerable challenges, RMST has been very successful in salvaging the wreck. In 1987, RMST conducted 60 days of research and recovery operations at the wreck site. *See* RMST's Periodic Report at 4 (filed Nov. 12, 1997). It recovered approximately 1800 artifacts during the course of 32 dives. *Id.* It also produced approximately 140 hours of videotape footage and 7,000 still photographs from the wreck site. *Id.* During the summer 1993 expedition, RMST recovered 800 artifacts and produced approximately 105 hours of videotape footage during the course of 15 dives. *Id.* During the 1994 expedition, RMST recovered over 1,000 objects and produced 125 hours of videotape footage from the wreck site. *Id.* And in 1996, RMST recovered 74 objects and produced approximately 125 hours of videotape. *Id.* In its May 10, 1996 Order, the Court found that "[t]o date, over 3,600 artifacts have been recovered from the wreck." *R.M.S. Titanic, Inc.,* 924 F.Supp. at 718.

RMST's onshore activities have also been exemplary. RMST cooperated with Discovery Communications, Inc. (The Discovery Channel) to produce three hours of television programing based on RMST's 1996 expedition. RMST's Periodic Report at 4–5 (filed Nov. 12, 1997). Two hours of the programming, presented in "Titanic: Anatomy of a Disaster," was the highest rated program in the history of The Discovery Channel when it aired in April 1997. *Id.*

In addition to this television documentary, RMST has exhibited artifacts from the R.M.S. TITANIC in museums in Norfolk, Virginia; Memphis, Tennessee; St. Petersburg, Florida; Long Beach, California; Hamburg, Germany; Stockholm, Sweden; Oslo, Norway; and Paris, France. *Id.* at 5–6; Transcript at 53 (May 27, 1998). Artifacts have also been displayed at the National Maritime Museum in Great Britain. RMST's Periodic Report at 7–8 (filed Nov. 12, 1997). During this exhibition, a record-breaking number of people visited the National Maritime Museum. *Id.*

RMST's current plans include continued world-wide museum exhibits, *id.* at 9, followed by the establishment of a permanent exhibition of all the artifacts at a museum somewhere in the United States. *Id.* RMST also plans future television documentaries from the R.M.S. TITANIC wreck site. *See* Transcript at 39–44 (May 27, 1998).

Other than receiving royalties from ticket sales at the various R.M.S. TITANIC artifact exhibits, RMST finances its continued operations through sales of licenses to third-parties for R.M.S. TITANIC artifact replicas, photographs, videos, wearing apparel, and other products. *See* RMST's Periodic Report at 19 (filed Nov. 12, 1997). With the exclusion of pieces of coal, RMST does not now, nor does it ever plan to, sell any artifacts for profit. *Id.* at 6, 7, 19; *see R.M.S. Titanic, Inc.,* 924 F.Supp. at 717.

**D.**

**1.**

RMST has learned about a planned commercial venture to provide members of the public with transportation to the wreck site and the opportunity to dive and photograph the R.M.S. TITANIC wreck for $32,500 per person. The commercial venture is planned and operated by Deep Ocean Expeditions, a newly formed company which has its office in the Isle of Man, Great Britain. *See* Exhibit 5 to Brief in Support of Motion for Preliminary Injunction (docketed May 11, 1998). Deep Ocean Expeditions was founded by Mr. Mike McDowell. *Id.* Connecticut-based travel firm Quark Expeditions and U.K.-based travel firm WildWings Worldwide Travel have issued promotional material for the photographic expedition. *See* Exhibits 4 and 5 to Brief in Support of Motion for Preliminary Injunction.

The promotional material states that the photographic expedition will take place in August 1998. *Id.* The expedition is further described as follows:

Now for the first time in history, a limited number of adventurers are being invited to participate in a once-in-a-lifetime expedition entitled, OPERATION TITANIC. This world-class opportunity exists for you to join a seasoned team of professional scientists, film-makers, and explorers to accomplish the task of viewing and recording one of the world's most amazing sights ... the TITANIC.

AS AN ACTIVE MEMBER OF THIS EXPLORATION, YOUR EXPEDITION INCLUDES ACTUALLY DIVING IN ONE OF THE MIR SUBMERSIBLES TO THE TITANIC.

\*　\*　\*　\*　\*　\*

Our expedition will be based aboard the AKADEMIK KELDYSH, which will act as 'mother ship' and support vessel for the MIR dive operation, as well as providing you with good quality accommodation and meals. The vessel will be located at the site of the TITANIC, which is about 368 miles to the south east of Newfoundland. KELDYSH will stay 'on site' during our expedition, with groups being moved back and forth using a suitable local boat from Newfoundland.

\*　\*　\*　\*　\*　\*

Deep dives to the TITANIC (at 12,460 feet or 3775 meters) will take place on a daily basis, assuming that weather and sea conditions are favorable. These dives will be for participants in the expedition, such as yourselves, with separate dives for scientists and professional photographers, who will be recording the wreck.

\*　\*　\*　\*　\*　\*

DEEP OCEAN EXPEDITIONS is planning and coordinating the OPERATION TITANIC expedition along with its colleagues and scientists from the P.P. SHIRSHOV INSTITUTE OF OCEANOLOGY located in Moscow. Both DEEP OCEAN EXPEDITIONS and all personnel from the SHIRSHOV INSTITUTE strongly believe that the integrity of the TITANIC

wreck and the surrounding debris field should be respected both as a historical site as well as a gravesite. Therefore, both parties will categorically avoid any collection of artifacts or pieces of the wreck, neither interfacing with nor damaging the wreck in any way. In no way is OPERATION TITANIC planned or conceived as a collection expedition—the sole exception being the photographs and lasting memories participants will bring back with them to the surface.

*Id.* Exhibit 5.

The promotional material indicates that other than members of the paying public, the expedition will include the following people: Dr. Anatoly Sagaievitch of the P.P. Shirshov Institute of Oceanology in Moscow, Dr. Alfred S. McLaren, Dr. Don Walsh, and Ralph White. *Id.* To dive on the wreck, the expedition will use Soviet made MIR submersibles based on the R/V AKADEMIK MSTISLAV KELDYSH. *Id.*

Lastly, the promotional material acknowledges RMST's salvor in possession rights. To this end, the material states: "Both DEEP OCEAN EXPEDITIONS and the SHIRSHOV INSTITUTE also recognize that there is a 'salvor in possession' claim recognized by an American Court under Admiralty Law, awarded to a U.S. company R.M.S. TITANIC INC." *Id.*

**2.**

On May 4, 1998, RMST filed a motion for preliminary injunction in its *in rem* salvage action to prevent Deep Ocean Expeditions from visiting the wreck site and photographing the wreck. RMST requests that the Court enter an order directed to:

Deep Ocean Expeditions, WildWings Worldwide Travel and its parent company Bakers World Travel, Quark Expeditions, Inc., Mike McDowell, Ralph White, Don Walsh, Ph.D., Alfred S. McLaren, Ph.D., the R/V AKADEMIK MSTISLAV KELDYSH, and their agents, servants, employees and all person in active concert and participation with them, prohibiting them from entering within ten (10) nautical miles of the wreck of the TITANIC for any purpose, and directing specifically that

they shall not take photographs or make visual images of the wreck or wreck site using film or videotape, and further directing them not to interfere in any way with the salvage expedition under the direction of RMST at the wreck site in August and September, 1998 . . . .

Motion for Preliminary Injunction at 1–2 (May 4, 1998).

Also on May 4, 1998, Christopher S. Haver filed a separate *in personam* action against RMST seeking a declaratory judgment that he has the right to enter the wreck site and photograph the wreck of the R.M.S. TITANIC. *See* Complaint for Declaratory Judgment at 4–5, *Haver v. R.M.S. Titanic, Inc.,* No. 2:98cv507 (E.D.Va. May 4, 1998). He avers that he has signed up with Deep Ocean Expeditions and intends to pay the $32,500 for transportation to the wreck. *Id.* at 3. He also avers that he wants to photograph and videotape the wreck solely for his own personal use and does not intend to recover any part of the wreck. *Id.* at 4.

On May 11, 1998, RMST filed an Amended Motion for Preliminary Injunction to include Haver in the list of persons it seeks to enjoin from visiting and photographing the wreck. *See* Amended Motion for Preliminary Injunction at 1 (May 11, 1998).

By Order entered May 12, 1998, the Court consolidated Haver's declaratory judgment action "with and into" the *in rem* salvage action because it "involves the same issues which are currently being litigated" in the *in rem* action. Order at 1 (May 12, 1998).

### 3.

On May 27, 1998, the Court conducted a hearing on RMST's motion for a preliminary injunction. RMST presented documentary evidence that all the parties it seeks to enjoin received notice of its motion for a preliminary injunction and notice of the hearing date. *See* Plaintiff's Exhibits 3, 4, & 5.[2] Haver was the only defendant to make an appearance to contest RMST's motion.[3] Based on RMST's evidence, the Court finds that all of the persons and entities whom RMST seeks to enjoin have received sufficient notice of its motion and the hearing date.

At the hearing, RMST called George H. Tulloch as a witness to give testimony in support of a preliminary injunction. Tulloch is the president of RMST. Transcript at 30 (May 27, 1998). He testified that RMST plans to be on the site salvaging the wreck during the entire month of August 1998. *Id.* at 31. They do not plan to leave the site until September 2, 1998. *Id.* at 78.

Tulloch also testified and introduced documentary evidence that RMST is chartering a French research vessel and submersible for the summer 1998 expedition from the Institute of France for the Research and Exploration of the Sea (IFREMER). *Id.* at 33–36; Plaintiff's Exhibit 1. RMST has already paid IFREMER $200,000 in down payment towards the $1,460,000 charter cost.[4] Plaintiff's Exhibit 1.

Tulloch further testified about RMST's plans for the summer 1998 expedition. It plans to recover a piece of the R.M.S. TITANIC's hull that has broken off from the rest of the wreck, *see* Transcript at 37, recover the Marconi transmitter, *id.* at 37–38, explore and salvage a newly discovered debris field that is high in content of fine china, *id.* at 38, and recover the B deck door on the port side that has fallen into the debris field

---

2. Notice of the hearing date was not physically delivered to Deep Ocean Expeditions and Mike McDowell because there was no one at their address when delivery of the notice was attempted. *See* Transcript at 105 (May 27, 1998). Nevertheless, the Court finds that Deep Ocean Expeditions and Mike McDowell had sufficient notice of the hearing to satisfy Fed.R.Civ.P. 65(a)(1). About the same time the delivery company was unsuccessfully attempting to deliver the hearing notice, Mike McDowell sent a letter to Haver on Deep Ocean Expeditions' letterhead. *See* Haver Exhibit 1. In the letter, McDowell indicates his knowledge that Haver was seeking court permission to participate in Deep Ocean Expeditions' planned voyage to the R.M.S. TITANIC. *Id.* Deep Ocean Expeditions and Mike McDowell could have easily obtained the date and time of the hearing from Haver.

3. Haver did not appear in court himself; he sent counsel.

4. RMST has used IFREMER's equipment and vessels during all its previous salvage operations on the R.M.S. TITANIC. Transcript at 36.

examined in 1996. *Id.* Also RMST, in conjunction with The Discovery Channel, will attempt a live television broadcast from the wreck site on August 16, 1998, at 9 p.m. eastern time. *Id.* at 39.[5] The broadcast will feature live video and audio from the wreck. *Id.* Before this live broadcast, National Broadcasting Company (NBC) will air a special on the 1998 expedition on its "Date Line" program on August 13, 1998. *Id.* at 43. Furthermore, RMST is planning to take the first optical images of the wreck in color. *Id.* at 43. It will also map a significant portion of the wreck with videos and photographs. *Id.* at 42.

RMST plans to have multiple ships, submersibles, and remote operating vehicles at the wreck site during its operations. *Id.* at 43–45. In order to carry out its planned salvage operations and practice for the photographic and video broadcasts it will carry out dive operations 24 hours a day. *Id.* at 45.

Tulloch testified that if another vessel outside of their expedition was on the site shuttling tourists down to the wreck, it would threaten their operations. *Id.* at 48. Tulloch does not believe that it would be safe for two submersibles to be exploring the wreck at the same time. *Id.* RMST would therefore be forced to stop its operations if another vessel and submersible were on the site. *Id.*

IFREMER has also expressed concern about competing submersibles diving the wreck at the same time. IFREMER considers it a "safety hazard to dive with other submersibles in the area of the wreck." *Id.* at 51; Plaintiff's Exhibit 2. It will not allow its submersible to dive on the wreck if other submersibles are in the area. Transcript at 49. Moreover, IFREMER "will expect charter hire to be paid by [RMST] to IFREMER" even if the presence of another submersible at the wreck site causes IFREMER to cease operations. *Id.* at 51; Plaintiff's Exhibit 2.

Tulloch testified that the summer 1998 expedition is very important to RMST because of its timing. With the public interest

heightened as a result of the ongoing artifact exhibits and the movie about the R.M.S. TITANIC, RMST is in a unique position to capitalize on the 1998 expedition. Transcript at 52. The Discovery Channel live television broadcast and NBC "Date Line" special will only enhance the public's awareness and knowledge of the wreck. Thus, the 1998 expedition is important for RMST's future artifact exhibits, licensing arrangements, and operations in general. *Id.* 52–53. "The opportunity is extremely broad for us at this moment to capitalize on [the wreck's publicity] as an educational, scientific and entertainment tool." *Id.* at 54.

Concerning public photographic expeditions to the wreck site, Tulloch testified that RMST has considered charging tourists for photographic trips to the wreck. *Id.* at 65. RMST has not yet, however, added tourist cruises and dives to its salvage plans because of safety concerns. *Id.* 65–66. Tulloch did not rule out the possibility that RMST will offer the public the chance to dive on and photograph the wreck in the future. *Id.* at 66.

In response to RMST's evidence, Haver presented a Declaration of Christopher S. Haver. *See* Haver Exhibit 1. Attached to the declaration is a letter from Mike McDowell to Haver stating that Deep Ocean Expeditions has some flexibility in scheduling and may move its expedition into September or dive during the evening hours when it is anticipated that RMST will not be conducting operations. *Id.*

After RMST objected to the admission of the McDowell letter as hearsay, the Court expressed its concern that offering this evidence in the form of a declaration and unsworn letter deprived RMST of its right of cross-examination. Transcript at 107. The Court received the affidavit and letter into evidence for a "limited purpose." *Id.* It was the Court's conclusion then, and still is now, that the facts contained in the letter from McDowell to Haver may not be relied upon because the letter is not written under oath

---

**5.** RMST's licensing contract with The Discovery Channel is worth approximately $6 million to the company. *See* Transcript at 42.

and McDowell was not present at the hearing for cross-examination. *Id.*

On June 2, 1998, Haver filed a Supplemental Declaration. The supplemental declaration again cites to an unsworn letter from McDowell to Haver and states in pertinent part as follows:

> Mr. McDowell informed me that he also had just learned for the first time that RMST planned an August expedition, and that, because of safety concerns, Deep Ocean Expeditions and the P.P. Shirshov Institute would reschedule their expedition to September once they could establish with certainty that [RMST] would be diving on the wreck in August.

Supplemental Declaration of Christopher Haver (June 2, 1998). The Court views this declaration with even more skepticism than the declaration that was introduced during the preliminary injunction hearing. McDowell received a copy of RMST's motion and supporting memorandum for a preliminary injunction that stated RMST's plans for an August 1998 expedition. *See* Plaintiff's Exhibit 4. He has likewise been in contact with Haver, who himself is well aware of RMST's salvage plans. Thus, a claim by McDowell that he just learned about RMST's plans to be on the site in August 1998 lacks credibility. In any event, even if Haver's declarations are believed, all he has proven is that Deep Ocean Expeditions *may* reschedule its operations until September to avoid RMST's expedition. And this is in contrast to Deep Ocean Expeditions' promotional material stating that the trip will take place in August. Given this conflict, the Court finds that the photographic expedition is planned for August 1998—the same time RMST will be on the site conducting salvage operations.[6]

## II.

Haver asserts three challenges to this Court's jurisdiction and ability to enter a preliminary injunction in this action. These issues will be addressed initially.

### A.

First, Haver challenges this Court's jurisdiction over the wreck and wreck site. He claims that the Court's *in rem* jurisdiction is defective because the original warrant for arrest was not served upon the vessel within the judicial district.

#### 1.

■ Throughout the pendency of this salvage case, the Court has exercised constructive *in rem* jurisdiction over the wreck itself based on the presence within the judicial district of physical items salvaged from the wreck.[7] It is settled salvage law that United States District Courts have jurisdiction to adjudicate salvage claims based on salvage operations that occur on the high seas. *See Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 640 F.2d 560, 566–67 (5th Cir.1981); *The John Gilpin,* 13 F. Cas. 675, 676 (S.D.N.Y. 1845). Practicalities sometimes dictate the impossibility of bringing the entire ship into a judicial district at any one time for salvage adjudication. *See Marex Int'l, Inc. v. Unidentified, Wrecked and Abandoned Vessel,* 952 F.Supp. 825, 828 (S.D.Ga.1997); *Moyer v. Wrecked and Abandoned Vessel, a/k/a Andrea Doria,* 836 F.Supp. 1099, 1104 (D.N.J. 1993); *Treasure Salvors, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 569 F.2d 330, 335 (5th Cir.1978). For instance, in this case the depth of the wreck of the R.M.S. TITANIC, along with its historical importance, compels meticulous and calculated salvage work over many salvage seasons. Despite these obstacles, however, the law of salvage demands the protection of the first salvor in possession from interference during the pendency of his salvage operations. *See Hener v. United States,* 525 F.Supp. 350, 357 (S.D.N.Y.1981) (stating that "[a] salvor will frequently seek the right to

---

6. The Court also notes that as a mere paying customer, Haver has no say in when or how Deep Ocean Expeditions conducts its operations.

7. The Court first exercised constructive *in rem* jurisdiction over the R.M.S. TITANIC in 1992. *See Marex Titanic, Inc. v. Wrecked and Abandoned Vessel, R.M.S. TITANIC,* 805 F.Supp. 375, 376, 378 (E.D.Va.1992), *rev'd on non-jurisdictional grounds,* 2 F.3d 544 (4th Cir.1993). The Court subsequently ordered the rearrest of the wreck at the request of RMST in August 1993. *See* Order at 1–2 (Aug. 27, 1993).

salvage without interference, and the law will grant such an exclusive right if the first salvor's effort is ongoing and has a 'fair prospect of success'"); *The AMERICAN FARMER,* 80 Lloyd's Rep. 672 (1947) (stating that "a principle which is always acted upon in this Court is that a subsequent salvor is not entitled to dispossess a prior salvor"); *The John Gilpin,* 13 F. Cas. 675, 676 (S.D.N.Y.1845) (No. 7345) (stating that the first salvors "had a right to retain [possession] until the salvage was completed, and no other person could interfere against them forcibly"); *The Hendry Ewbank,* 11 F. Cas. 1166, 1170–71 (C.C.D.Mass.1833) (No. 6376) (Story, J., stating that "[n]o other persons, without [the first salvor's] consent, could intrude themselves upon that possession, or gain a title to be deemed co-salvors").

█ The constructive *in rem* arrest allows an admiralty court to properly administer the salvage of a wreck and protect the salvor in possession when it is impossible to bring the entire wreck into the judicial district at a single point in time. *See Marex Int'l, Inc.,* 952 F.Supp. at 828 (wreck located 18 nautical miles east of Myrtle Beach, South Carolina); *Bemis v. RMS Lusitania,* 884 F.Supp. 1042, 1044 (E.D.Va.1995) (wreck located 12 miles off the coast of Ireland), *aff'd,* 99 F.3d 1129 (4th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 1558, 140 L.Ed.2d 791 (1998); *Columbus–America Discovery Group, Inc. v. Unidentified, Wrecked and Abandoned Sailing Vessel,* 742 F.Supp. 1327, 1333–34 (E.D.Va.1990) (wreck located 160 miles off the coast of South Carolina), *rev'd on other grounds,* 974 F.2d 450 (4th Cir. 1992), *cert. denied,* 507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993). When a salvor in possession brings part of a wreck into an admiralty court for *in rem* arrest, he has proven his salvor status and perfected a maritime lien that is only enforceable in an *in rem* action. *See The Sabine,* 101 U.S. 384, 384–85, 25 L.Ed. 982 (1879) (stating that a

salvage lien attaches when a salvor has been successful "in whole or in part"); *The Brig Ann,* 13 U.S. (9 Cranch) 289, 291, 3 L.Ed. 734 (1815) (stating that the *res* "is constructively [within the court's possession] when, by a seizure, it is held, to ascertain and enforce a right or forfeiture which can alone be decided by a judicial decree *in rem.*"). The salvor in possession is thereafter entitled to protection from rival salvors and others who might interfere with his ongoing operations. *See Hener,* 525 F.Supp. at 357; *The AMERICAN FARMER,* 80 Lloyd's Rep. 672; *The John Gilpin,* 13 F. Cas. at 676; *The Henry Ewbank,* 11 F. Cas. at 1170–71.

█ On August 27, 1993, as proof of its ability and intention to salvage the wreck of the R.M.S. TITANIC, RMST presented to the Court a wine decanter salvaged from the wreck. *See* Transcript at 6 (Aug. 27, 1993). In its arrest order, the Court found that "portions of the *in rem* Defendant are or shortly will be within this district during the pendency of this action ...." Order at 1–2 (Aug. 27, 1993). This language parallels the language of Supplemental Admiralty Rule C which authorizes an *in rem* action when the res "is within the district or will be during the pendency of the action." Supplemental Admiralty Rule C(2). The arrest papers were served on the portions of the *in rem* Defendant within the district and on RMST as substitute custodian and salvor who had possession of the wreck. *See* Order at 1–2 (Aug. 27, 1993); Process Receipt and Return (docketed Sept. 1, 1993). Thus, the Court assumed *in rem* jurisdiction over those portions of the R.M.S. TITANIC within the judicial district and constructive *in rem* jurisdiction over the R.M.S. TITANIC wreck site. This constructive *in rem* jurisdiction serves merely to protect RMST from interference in its ongoing salvage operations.[8]

A recognized assumption in an *in rem* action is that a physical arrest of the *res* places those who have an interest in the *res*

---

8. Haver alleges that other than the original wine decanter, no salvaged artifacts are within the judicial district. Many of these artifacts are being exhibited in museums around the world, *see supra* pt. I. C., or are in France being conserved. Nevertheless, all the artifacts are within the possession of RMST or its agents as the Court's substitute custodian. *See* Order Appointing Substitute Custodian at 2–3 (Aug. 27, 1993). The Court maintains *in personam* jurisdiction over RMST and could order RMST to move all the artifacts into the judicial district if necessary to satisfy any competing ownership or salvage claim.

on notice of the *in rem* proceeding. *See The Mary,* 13 U.S. (9 Cranch) 126, 144, 3 L.Ed. 678 (1815). Thus, persons having an interest in the wine decanter that was actually arrested received notice of this action when the United States Marshal arrested it. To notify potential claimants about the *in rem* action against the wreck itself, the rules require, and in this action the Court ordered, publication of the arrest in various newspapers. *See* Supplemental Admiralty Rule C(4); E.D. Va. Local Admiralty Rule (c)(3); Order for Issuance of Warrant of Arrest at 3 (Aug. 27, 1993). Publication in a newspaper gives notice to the world of the *in rem* action. *See Darlak v. Columbus–America Discovery Group,* 59 F.3d 20, 22 (4th Cir.1995), *cert. denied,* 516 U.S. 1094, 116 S.Ct. 817, 133 L.Ed.2d 761 (1996) (holding that competing salvor was too late in asserting a claim after the liability phase of the proceedings were complete). If notice is provided "in a newspaper of general circulation," *id.* at 23 n. 6, "[t]he whole world, it is said, are parties in an admiralty cause; and, therefore, the whole world is bound by the decision." *Id.* at 22–23 (quoting *Thorsteinsson v. M/V DRANGUR,* 891 F.2d 1547, 1553 (11th Cir.1990)); *see The Mary,* 13 U.S. (9 Cranch) at 144. In September 1993, RMST published notice of the *in rem* action in *The Virginian–Pilot, The Wall Street Journal,* and *The Journal of Commerce.* Consequently, for admiralty law purposes the whole world had notice that rights to the wreck of the R.M.S. TITANIC were being litigated in this Court. Any current claim of ignorance to the *in rem* salvage action is necessarily foreclosed.

**2.**

■ Exercise of *in rem* jurisdiction for the purpose of salvaging the wreck of the R.M.S. TITANIC is consistent with international law. It is undisputed that the wreck lies in international waters. Under the 1982 Law of the Sea Convention, international waters—or the high seas—are free to all states, *see* Law of the Sea Convention of 1982, Art. 87, and no state may exercise sovereignty over any part of the high seas, *see id.* Art. 89. Yet, these rules must be harmonized with the internationally recognized rules of salvage.[9]

Salvage law recognizes a salvor's "right to equitable remuneration." Salvage Convention of 1910, Art. 2; *The Sabine,* 101 U.S. at 384–85. It recognizes the priority of the first salvor. *See The TUBANTIA,* 18 Lloyd's List L. Rep. 158, 161 (1924); *Twenty–Three Bales of Cotton,* 24 F. Cas. 419 (E.D.N.Y. 1877) (No. 14,284). It recognizes the right of the salvor in possession to complete his salvage work free of interference by rivals. *See Hener,* 525 F.Supp. at 357; *The AMERICAN FARMER,* 80 Lloyd's Rep. 672; *The John Gilpin,* 13 F. Cas. at 676; *The Henry Ewbank,* 11 F. Cas. at 1170–71. It recognizes the salvor's right to bring the *res* into a convenient port to adjudicate the salvage lien. *See The La Bruce,* 14 F. Cas. 905 (Super.Fla.1837) (No. 7963). Essentially, therefore, the internationally recognized principles governing salvage on the high seas encourage the exercise of *in rem* jurisdiction over a wreck site to facilitate the salvage operation itself. *See* Norris, 3A *Benedict on Admiralty* § 1 (7th ed.1997).

The Court finds that the exercise of constructive *in rem* jurisdiction over the R.M.S. TITANIC wreck site to facilitate RMST's salvage operations is reasonable under international law. *See* Restatement (Third) of Foreign Relations Law § 403 (proscribing the exercise of extra-territorial jurisdiction that is "unreasonable"). RMST has brought part of the wreck into this Court seeking to be appointed sole salvor in possession under generally recognized salvage law. It is in the interest of the whole world to have salvage claims decided in a single forum so that multiple, conflicting litigation is avoided. The whole world is placed on notice of the action in this Court by the publication of notice of the *in rem* arrest. Moreover, the recognized international rights at stake are minimally infringed upon. Restricting free-

---

9. The law of salvage is an integral part of the general maritime law, *see The Blaireau,* 6 U.S. (2 Cranch) 240, 264, 2 L.Ed. 266 (1804), which is itself considered to be part of the *jus gentium. See The Belgenland,* 114 U.S. 355, 362, 5 S.Ct. 860, 29 L.Ed. 152 (1885) (stating that "salvage is a question of *jus gentium* "); Gilmore, *The Law of Admiralty* § 8–1 (2d ed.1975). *Jus gentium* is the law of nations—"[t]hat law which natural reason has established [and] all nations use." *Black's Law Dictionary* 997 (4th ed.1968).

dom of navigation over a few square miles of the vast North Atlantic Ocean is hardly a significant intrusion.[10]

### B.

Haver next claims that this Court may not enjoin him from visiting the wreck site because he is not a party to the salvage action. This assertion is incorrect.

Haver filed an *in personam* action against RMST seeking a declaratory judgment that he has the right to visit the wreck site to take photographs. *See* Complaint for Declaratory Judgment, *Haver v. R.M.S. Titanic, Inc.*, No. 2:98cv507 (E.D.Va. May 4, 1998). By Order entered May 12, 1998, the Court consolidated his declaratory judgment action "with and into" the *in rem* salvage action because it "involves the same issues which are currently being litigated" in the *in rem* action. Order at 1 (May 12, 1998). Thus, Haver is a party to the *in rem* action. In addition, the Court retains *in personam* jurisdiction over Haver because he has filed an action in this Court.

Yet, for the purpose of RMST's preliminary injunction motion, this point is irrelevant. RMST has properly moved for a motion for a preliminary injunction against Haver. Haver has been served with notice of the motion and has appeared by counsel in opposition to the motion. He may not now claim that the Court has no authority to enjoin him. *See* Fed.R.Civ.P. 65(a)(1) (requiring bare "notice to the adverse party" before an injunction may be issued).

### C.

Third, Haver claims that no preliminary injunction may issue because RMST has not filed a new complaint with the Court. He argues that when this Court awarded RMST salvor in possession status, it closed the *in rem* action. Now, Haver argues, a new complaint must be filed by RMST

against Haver and the others RMST wants to enjoin for a preliminary injunction to issue.

Haver's argument fails because the *in rem* action is not over. As long as the salvor in possession continues to salvage the *in rem* Defendant, the Court has jurisdiction to litigate claims to that Defendant and award salvage rights to the salvor. The *in rem* case is not over until all claims—salvage or otherwise—are resolved. *See* Order at 3–4 (Apr. 1, 1996) (holding that a competing salvor had standing to challenge RMST's salvor in possession status and the Court had discretion to reconsider its previous orders in the *in rem* salvage action). Since the salvor is still performing salvage operations, the *in rem* case is still pending, and an injunction may properly issue pursuant to the Federal Rules of Civil Procedure.

### III.

Haver's declaratory judgment request and RMST's motion for a preliminary injunction both involve one question of law that the Court has previously resolved in the *in rem* action—whether salvor in possession rights include the right to exclude others from visiting the wreck site to photograph the wreck. In an Order entered August 13, 1996, the Court decided this issue in the affirmative and preliminarily enjoined various parties from visiting the wreck site to photograph the wreck. Order at 3–5 (Aug. 13, 1996). The Court's conclusion was based upon two grounds.

First, the salvor in possession has a right to salvage the wreck free from the interference of others. In a case of historical and archeological salvage, interference may take two forms—interference with the salvor's active operations and interference with the wreck itself. If a photographic expedition is on the site at the same time RMST plans to carry on salvage operations, RMST may be forced to abort its salvage plans in the inter-

---

10. This case highlights the quandary of a salvor on the high seas when he is unable to bring the entire ship into any one port at any given time. At the preliminary injunction hearing, RMST's president testified that RMST took steps with the Minister of the Sea in France to file a salvage action there. Transcript at 77 (May 27, 1998).

After weighing its options, RMST elected to invoke the jurisdiction of this Court rather than proceed with the salvage case in France. *Id.; cf. The La Bruce,* 14 F. Cas. at 905 (recognizing the salvor's right to choose a convenient port and forum in which to adjudicate its salvage lien).

ests of safety. Next, "[i]t is obvious to the Court that because of the darkness caused by the depth and location of the TITANIC one would have to get very close to the wreck and on the site with powerful lights in order to take photographs . . . ." Order at 3 (Aug. 13, 1998). Because photographers must work so close to the wreck, there is a significant risk of interference with or injury to the wreck itself. *See* Transcript at 59 (Aug. 12, 1996) (the Court stating that "there's been no evidence here that anybody can take a picture in two and-a-half miles depth of water without getting into the site, which the court said was exclusively under the right and direction of [RMST]"). This has the potential of spoiling the historical and archeological value of the wreck itself,[11] which the salvor in possession has a duty to protect. *See* Law of the Sea Convention of 1982, Arts. 149 and 303; *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.,* 974 F.2d 450, 468 (4th Cir.1992), *cert. denied,* 507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993); *Marex Int'l v. Unidentified, Wrecked and Abandoned Vessel,* 952 F.Supp. 825, 829 (S.D.Ga.1997).

The second rationale for excluding third-party photographers involves allowing RMST to at least recoup its investment in the salvage operations.[12]

> [RMST] has expended time, efforts, money, and ingenuity over a period of approximately nine years in locating the wreck, starting salvage operations, and continuing salvage operations. The Court granted [RMST] possession of the wreck site for monetary gain in order to compensate it for these efforts and to encourage their continuation.
>
> \*     \*     \*     \*     \*     \*
>
> Further, this is not the ordinary salvage case. The TITANIC has special historical significance and the Court recognizes the

efforts of [RMST] in both preservation of the artifacts and its willingness not to sell the artifacts, thereby keeping them together in the public interest. In this "historical salvage" case, the Court finds that it is desirable to keep these artifacts together for the public display and, therefore, traditional salvage rights must be expanded for those who properly take on the responsibility of historic preservation. *MDM Salvage, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel,* 631 F.Supp. 308 (S.D.Fla.1986). This ruling is consistent with the importance the Fourth Circuit has given to the archeological and historical preservation efforts of a salvage operation such as that of the TITANIC. *Columbus–America Discovery [Group] v. Atlantic Mut. Ins.,* 974 F.2d 450 (4th Cir. 1992), citing with approval *MDM Salvage.* Therefore, if [RMST] is not selling artifacts like traditional salvors, it must be given the rights to other means of obtaining income.

Order at 3–4 (Aug. 13, 1996). The Court concluded that it "is of the opinion that photographs can be marketed like any other physical artifact and, therefore, the rights to images, photographs, videos, and the like belong to [RMST]." *Id.* at 3.

The legal conclusion that RMST's salvor in possession rights encompass and include the right to exclude third-party photographers from the wreck site has not been reversed on appeal. The Fourth Circuit summarily dismissed the appeal of the August 13, 1996 Order "with prejudice." Order at 3 (4th Cir. Dec. 6, 1996). The Fourth Circuit issued no opinion and formulated no legal conclusions on the issue. Consequently, at least in this Court, this legal conclusion has become law of the case. *See Illinois v. Illinois Cent. R.R. Co.,* 184 U.S. 77, 91, 22 S.Ct. 300, 46 L.Ed. 440 (1902); *Sejman v. Warner–Lam-*

---

**11.** An example of spoliation of the R.M.S. TITANIC wreck occurred in 1996 when RMST found and recovered a propeller protector from a modern submersible on the wreck and observed damage to the wreck caused by the propeller protector. *See* Affidavit of P.H. Nargeolet (Exhibit 1 to RMST's Brief in Support of Motion for Preliminary Injunction).

**12.** Chief Justice Marshall instructively states the policy of allowing "a very ample compensation for" salvage services in *The Blaireau,* 6 U.S. (2 Cranch) 240, 266, 2 L.Ed. 266 (1804). An award "very much exceeding the mere risk encountered and labor employed in effecting them, is intended as an inducement to render them, which is for the public interests, and for the general interests of humanity . . . ." *Id.*

*bert Co.,* 845 F.2d 66, 68–69 (4th Cir.1988), *cert. denied,* 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990); *Dodd v. Union Indem. Co.,* 32 F.2d 512 (4th Cir.), *cert. denied,* 280 U.S. 581, 50 S.Ct. 33, 74 L.Ed. 631 (1929).

### IV.

■ RMST moves for entry of a preliminary injunction forbidding third-parties from visiting the wreck site to photograph the wreck. The motion is granted.

### A.

In this Circuit, "a hardship balancing test applies to determine the granting or denial of a preliminary injunction." *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 812 (4th Cir.1991). That test, first announced in *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977), demands the consideration of four factors:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
>
> (2) the likelihood of harm to the defendant if the requested relief is granted,
>
> (3) the likelihood that the plaintiff will succeed on the merits, and
>
> (4) the public interest.

*Direx Israel, Ltd.,* 952 F.2d at 812.

In assessing these factors, the irreparable harm to the plaintiff and defendant are the most important. *Id.* Also, RMST bears the burden of establishing the four factors in support of granting an injunction. *Id.*

### B.

*Irreparable harm to RMST.* If no preliminary injunction is entered, RMST will suffer irreparable harm in several respects. The unrefuted evidence at the preliminary injunction hearing was that RMST planned to conduct 24 hour salvage operations at the site throughout the month of August 1998. Notwithstanding Haver's declarations that Deep Ocean Expeditions *may* reschedule its expedition until September, Deep Ocean Expeditions' promotional material indicates that the photographic expedition will take place in August. If the photographic expedition is on the site in August, RMST will be precluded from conducting its salvage operations for safety reasons and could lose a salvage season. Such a loss would be detrimental to RMST since it is trying to capitalize on the current public relations boon that has resulted from its past efforts to publicize the wreck and the R.M.S. TITANIC movie.

If RMST is forced to cancel or reschedule its salvage operations because of the presence of the photographic expedition at the wreck site, it will also incur substantial monetary losses. RMST has a web of contracts and agreements in place that are all dependent upon the 1998 salvage expedition. The most important of these are the charter agreement with IFREMER worth almost $1.5 million and the licensing rights with The Discovery Channel and NBC worth $6 million. While this money is certainly compensable in a court of law,[13] Haver and the others RMST seeks to enjoin have made no showing that they would be able to pay a judgment in excess of $7.5 million.

Lastly, despite admonitions in the promotional literature to the contrary, the Court is concerned that the Deep Ocean Expeditions operation will tamper with the wreck itself.[14] Any intentional or unintentional alteration of the wreck site will disrupt RMST's meticulous salvage operations and efforts to historically catalog the wreck.

---

**13.** *See Hughes Network Systems, Inc. v. InterDigital Communications Corp.,* 17 F.3d 691, 694 (4th Cir.1994) ("Where the harm suffered by the moving party may be compensated by an award of money damages at judgment, courts generally have refused to find that harm irreparable.").

**14.** The Court's concern is justified because at some point before RMST's summer 1996 expedition, a MIR submersible dove on and damaged the wreck. During its 1996 expedition, RMST recovered the propeller protector from one of the two MIR submersibles based on the R/V AKADEMIK MSTISLAV KELDYSH and observed damage to the wreck caused by the dislodged propeller protector. *See* Affidavit of P.H. Nargeolet (Exhibit 1 to RMST's Brief in Support of Motion for Preliminary Injunction). The same submersible could have the same mishap if it returns to the wreck in 1998 with tourists aboard.

*Irreparable harm to defendants.* Haver and the other people RMST seeks to enjoin have made an insufficient evidentiary showing concerning the irreparable harm they will suffer if enjoined. Haver is the only non-movant to produce any evidence of irreparable injury. His first declaration states that his "sole purpose in participating in [the photographic] expedition is to experience this unique adventure to observe firsthand the most famous shipwreck of all time. [He] believe[s] that this opportunity to observe the wreck of the *Titanic* is unparalleled and irreplaceable." Haver Exhibit 1. Haver's supplemental declaration avows similar nostalgic injury: "if I cannot participate in an expedition conducted by Deep Ocean Expeditions, I will not be able to view the *Titanic* as it rests on the floor of the North Atlantic Ocean at all." Supplemental Declaration of Christopher S. Haver at 2 (June 2, 1998).

Even if barred from personally diving on the wreck, participants in the photographic expedition will have the opportunity to view and experience the R.M.S. TITANIC when RMST and The Discovery Channel air their live television broadcast from the wreck site in August 1998. Haver and the others will save the $32,500 expedition cost by staying home and watching The Discovery Channel's production. Furthermore, in balancing the alleged sentimental harm of failing to view and photograph the wreck "firsthand" against RMST's harm of losing a salvage season, losing the exclusive rights to license photographs of the wreck for fees, and having the wreck tampered with, the Court finds that RMST's harm significantly outweighs any harm to the photographic expedition. RMST has been professionally salvaging the wreck since at least 1987. It has invested significant time and resources into its operations during this time period. Even comparing RMST's harm with the quixotic harm of a band of adventure tourists borders on the irrational.

*Success on the merits.* The Court finds that RMST will likely succeed on the merits of this issue because as a matter of law its salvor in possession rights include the exclusive right to exclude others from the wreck site and the exclusive right to photograph, video, and take images of the wreck of the R.M.S. TITANIC. *See supra* pt. III.

*Public interest.* The Court finds that it is in the public interest for RMST to continue to salvage the wreck without interference from others. Indeed, a fundamental principle of salvage law—as it is applied by all commercial and sea-going nations—is that a salvor in possession has an exclusive right to complete his job unhindered by others. *See* Gilmore, *The Law of Admiralty* § 8–1 (2d ed.1975); *Hener*, 525 F.Supp. at 357; *The AMERICAN FARMER*, 80 Lloyd's Rep. 672; *The TUBANTIA*, 18 Lloyd's List L. Rep. at 161; *The John Gilpin*, 13 F. Cas. at 676; *The Henry Ewbank*, 11 F. Cas. at 1170–71.

Haver cites the R.M.S. Titanic Maritime Memorial Act of 1986 (the Act), 16 U.S.C. § 450rr *et seq.*, and argues that Congress has determined that it is in the public interest for him to photograph the wreck, while it is not in the public interest for RMST to salvage the wreck. The Act requests that the Executive Branch enter into negotiations with Canada, France, Great Britain, and other interested countries for a treaty and international guidelines to govern the wreck site. *See* 16 U.S.C.A. §§ 450rr–3, 450rr–4 (West 1992).[15] The Act then states that

> [i]t is the sense of Congress that research and limited exploration activities concerning the R.M.S. Titanic should continue for the purpose of enhancing public knowledge of its scientific, cultural, and historical significance: Provided, That, pending adoption of the international agreement described in section 450rr–4(a) of this title, or

**15.** The Act "direct[s]" the Executive Branch to enter into these negotiations. 16 U.S.C.A. § 450rr–3. When he signed the measure, President Ronald Reagan issued a formal statement supporting the purpose of the Act but taking issue with the language requiring the Executive Branch to exercise its foreign affairs powers. "If interpreted literally, these requirements would contravene my constitutional authority to conduct foreign relations." Statement by President Ronald Reagan Upon Signing S.2048, 22 Weekly Comp. Pres. Doc. 1421, 1986 U.S.C.C.A.N. 4074 (Oct. 21, 1986). Thus, "[t]o avoid this constitutional difficulty," the Executive Branch has always "viewed" the provisions of the Act "as discretionary." *Id.*

implementation of the international guidelines described in section 450rr–3 of this title, no person should conduct any such research or exploration activity which would physically alter, disturb, or salvage the R.M.S. Titanic.

16 U.S.C.A. § 450rr–5. Immediately following this section, Congress disclaims any extra-territorial sovereignty over the wreck site by stating that "the United States does not assert sovereignty, or sovereign or exclusive rights or jurisdiction over, or the ownership of, any marine areas of the R.M.S. Titanic." 16 U.S.C.A. § 450rr–6.

No treaty, as envisioned by the Act, has ever been negotiated. The Executive Branch invited other nations to enter into such negotiations but received no interest. *See* Letter from J. Edward Fox, Asst. Secretary of State to Chairman, House Committee on Merchant Marine and Fisheries, dated Aug. 10, 1987 (Exhibit 8 to RMST's Rebuttal Brief in Support of Motion for Preliminary Injunction). Moreover, it does not appear that negotiations will ever begin. *See id.* Twelve years have gone by since the Act was passed and no negotiations have ensued. Meanwhile, the wreck is in international waters and no country or combination of countries has territorial jurisdiction over it. The only law that governs is the internationally recognized principles of admiralty and maritime law (including the law of salvage).

Consequently, we are left with (i) a world-famous historic shipwreck, (ii) advancing technology that results in easier access to that shipwreck, (iii) numerous undersea explorers, salvage companies, and thrill-seekers who desire to exploit the wreck, and (iv) no international agreement or enforceable rules to govern that exploitation. The Act does nothing to address or resolve these competing interests. Salvage law, however, provides policies and rules that do address these interests. *See, e.g., Hener*, 525 F.Supp. at 358 (stating that salvage law's "application enables courts to encourage open, lawful, and cooperative conduct, all in the cause of preserving property (and life)."). To determine the public interest, the Court will therefore revert to the policies underlying salvage law and other international rules governing the treatment of shipwrecks having historical significance.

"[T]he saving of imperiled maritime property" is and always has been in the public interest. Norris, 3A *Benedict on Admiralty* § 1 (7th ed.1997); *see* Schoenbaum, 2 *Admiralty and Maritime Law* § 16–1 (2d ed. 1994) ("The law of marine salvage developed in response to important social policies, to encourage efforts to save property …"); Gilmore, *The Law of Admiralty* § 8–1 (2d ed. 1975) ("Public policy … encourages the hardy and adventurous mariner to engage in" salvage service). The ancient and modern salvage cases demonstrate that it is beneficial for a single salvor to return imperiled property to its owner. *See R.M.S. Titanic, Inc.*, 924 F.Supp. at 719; *Columbus–America Discovery Group*, 974 F.2d at 460–61; *MDM Salvage, Inc.*, 631 F.Supp. at 311–12; *Hener*, 525 F.Supp. at 357; *The TUBANTIA*, 18 Lloyd's List L. Rep. at 161; *The John Gilpin*, 13 F. Cas. at 676; *The Henry Ewbank*, 11 F. Cas. at 1170–71.

Modern international law and salvage law also encourage the preservation of a shipwreck's archaeological and historical integrity.

> All objects of an archeological and historical nature found in the Area [i.e., the high seas] shall be preserved or disposed of for the benefit of mankind as a whole, particular regard being paid to the preferential rights of the State or country of origin, or the State of cultural origin, or the State of historical and archeological origin.

Law of the Sea Convention of 1982, Art. 149; *see also id.* Art. 303 (concerning historical and archeological artifacts salvaged from a state's contiguous zone). Courts administering salvage law recognize these policies and reward the salvor who preserves or enhances the historical value of a wreck. *See, e.g., Columbus–America Discovery Group*, 974 F.2d at 468.

In this case, RMST is salvaging and preserving the artifacts salvaged from the wreck for the benefit of all mankind. While RMST is a for-profit corporation, it views its role in salvaging the wreck as more of a scientific and educational undertaking than a capitalist enterprise. George Tulloch, RMST's presi-

dent, testified that he believes RMST maximizes shareholder value "[b]y doing your first four jobs the best that they can be done. Recover, conserve, exhibit, and protect the wreck. Money will take care of itself after that if I have done it well and used professionals every step of the way." Transcript at 71 (May 27, 1998). RMST is not exploiting the wreck for profit. *See R.M.S. Titanic, Inc.*, 924 F.Supp. at 717. It does not sell artifacts. After it properly treats and preserves recovered artifacts, it places them in world-wide museum exhibits for the whole world to see. *See* RMST's Periodic Report at 5–8 (filed Nov. 12, 1997). Moreover, after it is finished its work on the R.M.S. TITANIC, RMST plans to house all the artifacts in one museum for the benefit of all mankind. *Id.*

In accord with salvage law, the Court finds that it is in the public interest for a single salvor to salvage the wreck of the R.M.S. TITANIC. RMST has been appointed as the single salvor. It is doing an acceptable job of salvaging the wreck in its deep ocean environment, maximizing the wreck's historical value, and returning the wreck's artifacts to society for the general use and education of all mankind. Thus, it is in the public interest for RMST to continue its operations unhindered.

Deep Ocean Expeditions' planned photographic expedition will only serve to disrupt RMST's operations and devalue RMST's salvor in possession rights. It ·will disrupt RMST's operations because a safety hazard arises when more than one expedition conducts dive operations at the site. Furthermore, if Deep Ocean Expeditions is granted leave for its photographic excursion, the disruption will not end there. All others who wish to conduct the same activity will assert the same right. This could result in multiple photographic excursions to the wreck site each year with no practical way for RMST to police the activities of the participants. Everyone says that they will only take pictures and will not salvage artifacts. Yet, artifacts are strewn across a large area of ocean floor and represent a great temptation for souvenir hunting photographers. Lastly, RMST's salvor in possession rights will be devalued if

the photographic expedition is allowed because the exclusive right to photograph the wreck is included in those salvor in possession rights. Adventure tourists should be paying RMST for the right to dive on and photograph the wreck rather than Deep Ocean Expeditions. Likewise, people who purchase photographs of the R.M.S. TITANIC should be purchasing photographs from RMST (a repeat salvor) and not from someone else who visits the wreck one time. Accordingly, the Court finds that it is not in the public interest for Deep Ocean Expeditions to visit the wreck site and photograph the wreck.

### C.

When the four *Blackwelder* factors are considered as a whole, the clear conclusion is that a preliminary injunction should be entered. Accordingly, the Court issues a preliminary injunction against Christopher Haver, Deep Ocean Expeditions, WildWings Worldwide Travel and its parent company Bakers World Travel, Quark Expeditions, Inc., Mike McDowell, Ralph White, Don Walsh, Ph.D., Alfred S. McLaren, Ph.D., the R/V AKADEMIK MSTISLAV KELDYSH, all their agents and employees, and anyone else having notice of this Opinion and Order. Until further order of this Court, these parties are ENJOINED from (i) interfering with the rights of RMST, as salvor in possession of the wreck and wreck site of the R.M.S. TITANIC, to exclusively exploit the wreck and wreck site, (ii) conducting search, survey, or salvage operations of the wreck or wreck site, (iii) obtaining any image, video, or photograph of the wreck or wreck site, and (iv) entering or causing anyone or anything to enter the wreck or wreck site with the intention of performing any of the foregoing enjoined acts. The wreck site encompasses a zone of rectangular shape, bound by the following points: 41° 46' 25" North Latitude, 050° 00' 44" West Longitude, then east to 41° 46' 25" North Latitude, 049° 42' West Longitude, then south to 41° 34' 25" North Latitude, 049° 42' West Longitude, then west to 41° 34' 25" North Latitude, 050° 00' 44" West Longitude, then returning north to the start. Nothing in this Opinion and Order shall be construed as restricting customary rights of

surface navigation on the high seas which do not otherwise violate the specific restrictions set forth above.

### D.

Federal Rule of Civil Procedure 65(c) states that no preliminary injunction should be issued unless security is posted by the applicant "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The clear language of this rule places the amount of a bond within the sound discretion of the district court. *Wilson v. Office of CHAMPUS,* 866 F.Supp. 903, 910 (E.D.Va.1994).

Haver and the other enjoined parties have offered no evidence of what their damages would be if wrongfully enjoined. The Court can only surmise that such damages would be minimal and speculative. Furthermore, these damages are very unlikely to be compensable because RMST has demonstrated that it is likely to succeed on the merits. The Court therefore assesses a bond of $0, with no surety required.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to counsel for Haver, counsel for RMST, and to those parties enjoined.

**IT IS SO ORDERED.**